174 So.2d 721 (1965)
Harold J. RABIN and R.E. Watson, Appellants,
v.
Doyle CONNER, as Commissioner of Agriculture of the State of Florida, Appellee.
No. 33974.
Supreme Court of Florida.
May 5, 1965.
Wilfred C. Varn, of Ervin, Pennington & Varn, Tallahassee, for appellants.
Earl Faircloth, Atty. Gen., Wilson Wright and Robert A. Chastain, Asst. Attys. Gen., *722 J. Ernest Webb, Wilton R. Miller, Tallahassee, M.W. Wells and Raymer F. Maguire, Jr., Orlando, for appellee.
O'CONNELL, Justice.
Appellants, Rabin and Watson, made application to the Florida Celery Advisory Committee for a temporary base quantity certificate to permit each appellant to produce and market 200,000 crates of celery during the 1964-65 season. Appellant Rabin received a temporary certificate permitting production and marketing of only 32,127 crates. Watson's application was denied.
Appellants then filed a complaint for declaratory decree in which they sought to have Chapter 573, F.S. 1963, F.S.A., and Rule 7I-3, Rules of The Department of Agriculture, declared invalid and the Chancellor held that the statute and the rule were not unconstitutional or void as applied to the appellants and denied the relief sought. This appeal followed.
Chapter 573, F.S.A., originally enacted in 1959, is divided into three parts. We are concerned here only with Part I, entitled the "Celery and Sweet Corn Marketing Law."
In adopting this part of the act the legislature made extensive findings as to the problems facing the celery producers and the economic waste resulting therefrom. The legislature also declared the marketing of celery to be affected with a public interest and explained that the provisions of the subject statute were "enacted in the exercise of the police powers of this state for the purpose of protecting the health, peace, safety and general welfare of the people of this state." F.S. Sec. 573.02 (3), F.S.A.
In Sec. 573.03 six purposes of the statute are set forth. What appears to be the basic purpose is stated as being "to enable celery * * * producers * * * with the aid of the state, to correlate more effectively the marketing of their agricultural commodities, with market demands therefor." The other purposes are stated to be: (1) to establish orderly marketing; (2) to provide for uniform grading and preparation for market; (3) to maintain present markets and develop new markets; (4) to eliminate or reduce economic waste in marketing and (5) to prevent, modify or eliminate trade barriers obstructing the free flow of celery to market.
Substantively the statute authorizes the Commissioner of Agriculture to regulate the marketing of celery through the issuance of marketing orders to be issued only upon approval by the number of handlers and/or producers prescribed in Sec. 573.11.
Among other things the statute, Sec. 573.17, provides that such a marketing order may contain provisions: (1) determining the existence of a surplus of celery, providing for its control and distribution, and equalizing the burden of its elimination, when necessary; (2) limiting the total quantity of celery which may be distributed or handled in the primary channel of trade (i.e., from the time of harvesting to time it leaves intrastate and enters interstate commerce) during any specified period; (3) allotting the quantity of celery which each handler may purchase from all producers; (4) allotting the quantity of celery which each handler may distribute or handle; and (5) allotting the quantity of celery which each producer may sell or have handled for his account. We do not list the other provisions permitted to be contained in a marketing order because they do not bear directly on the decision of this case.
As can be seen from the foregoing paragraph, the regulation of the celery segment of the agricultural industry in Florida is authorized to be accomplished, not by regulating the quantity of celery which may be produced, i.e., grown, but rather by controlling the quantity which may be marketed, i.e. placed in intrastate commerce, in the state in any prescribed period. This control may be exercised in one or more of three ways. First, the marketing order *723 may prescribe the number of crates that each producer or grower may harvest and sell to or have sold by a handler. Second, it may prescribe the number of crates that each handler may buy from or handle for the producers. Third, it may prescribe the number of crates that each handler may sell, distribute, or handle in intrastate commerce, i.e., place in the "primary channel of trade."
All of the terms used in this opinion are defined in the statute and are used in accordance with the statutory definition.
Following enactment of ch. 573 the Commissioner of Agriculture promulgated the marketing order, Rule 7I-3, which, as amended in 1962, is the order under attack here. Insofar as relevant here, this order did three things: (1) it established the celery growing seasons of the years 1960-61 and 1961-62 as the representative or base period to be used in determining the "permanent base quantities" that would be allotted to the producers of celery; (2) it fixed permanent base quantities only for those persons who had grown celery during the representative period, 1960-61 and 1961-62, the quantities allotted being calculated on the amounts each produced during that period; and (3) despite the absence of statutory authority therefor, it provided for the award of "temporary base quantities" to new producers, i.e., to persons who had not produced during the base period 1960-61 and 1961-62. These provisions will be described in greater detail below.
Appellants, Rabin and Watson, did not produce celery during the base period 1960-61 and 1961-62, and therefore did not qualify for permanent base quantity certificates. Appellant Watson, however, alleged that he had for 18 years grown, produced and marketed celery in South Florida.
As stated earlier each of the appellants applied for a temporary base quantity of 200,000 crates. Appellants were 2 of 17 applicants for temporary certificates, the requests totalling 1,395,000 crates. Temporary certificates, each for 32,127 crates, were issued to Rabin and 5 other applicants. The other applications were denied.
On this appeal the appellants contend that: (1) the marketing order is not in compliance with ch. 573 which authorizes its issuance; and (2) that the marketing order and the statute are both violative of both the Florida and United States Constitutions.
The first contention is easily answered in the negative. Subsequent to the promulgation of Rule 7I-3, ch. 63-123, which now appears as F.S. Sec. 573.28, F.S.A. was adopted by the legislature. This section of the statute affords to any marketing order issued pursuant to ch. 573 and in effect at the time of its passage a conclusive presumption of conformity with the statute unless found to the contrary by the Commissioner, which he has not done. For present purposes, at least, we consider this amendatory statute as virtually incorporating into ch. 573 all outstanding market orders, in the absence of contrary action by the Commissioner.
The attack on the constitutionality of the order and the statute is more difficult of decision. This assault is three pronged. It is argued: first, that both the statute and the order contravene the commerce clause of Article I, Section 8 of the Federal Constitution; second, that they constitute an unwarranted exercise of the police power of the state and therefore violate the due process and equal protection guarantees found in Sections 1 and 12, Declaration of Rights, Florida Constitution, F.S.A., and in the Fourteenth Amendment to the Federal Constitution; and third, that they constitute an unlawful delegation of legislative power.
Inasmuch as the issue for decision directly involves only the regulation of the marketing of celery by producers, we will limit our discussion to those portions of the statute and marketing order which affect producers of celery as distinguished from handlers. A brief study of that portion of *724 the statute directly involved, Sec. 573.17(1) (d), will assist in pointing up the fatal defect which we detect in that subsection of the statute and in the marketing order.
As stated above, the main thrust of the marketing order was to allocate permanent base quantities to those who produced celery during the 1960-61 and 1961-62 seasons. Rule 7I-3.09(2). However, Section 7I-3.06 (3) of the marketing order provides that the base quantities are to be "based upon the current season's production or sales, or sales of such producers, to the end that the total quantity of such celery * * * so purchased from or handled * * * shall be apportioned equitably among all such producers." Thus, it appears that the allotments of base quantities were not made on the basis prescribed in the marketing order itself, i.e., on a basis of current season's production or sales.
Prior to its amendment by Chapter 63-123, Laws of Florida, F.S. Section 573.17 (1) (d) F.S.A., which authorized the regulation of production by allotments to producers, provided that such allotments were to be "based upon the current season's production or sales, or sales of such producers," the identical basis provided in Section 7I-3.06(3) of the marketing order. Chapter 63-123 then amended F.S. Section 573.17 (1) (d), F.S.A. to read that allotments to producers were to be based (1) upon the amounts of celery placed in the primary channel of trade by such producers in a prior period which the Commissioner finds to be representative, or (2) upon the current season's productions or volume sold, or (3) upon both (1) and (2), so as to apportion equitably among all producers the total quantity of celery permitted to be sold.
As first adopted, and as it now stands, Section 7I-3.06(3) of the marketing order was consistent with the statute, Section 573.17(1) (d), prior to its amendment in 1963. The actual allotment of the base quantities under the marketing order, Section 7I-3.09, was never in conformity with Sec. 7I-3.06(3) of the order and was not in conformity with the statutory authorization until the amendment of the statute in 1963. It is apparent that what happened is that the statute was amended to make it conform to Section 7I-3.09 of the marketing order rather than making the marketing order conform to the statute.
Other aspects of the marketing order must be detailed. Section 7I-3.09 of the order determined that permanent base quantities should be allotted on the basis of the production or sales of producers during the 1960-61 and 1961-62 seasons, which the Commissioner found to be a "representative period." The order then proceeded to allot permanent base quantities totalling 7,710,482 crates to some 36 firms and individuals. Several of the certificateholders bear the same family name. The quantities allotted range from a low of 3,920 crates to a high of 2,017,011 crates to one firm or person. Five of the certificates account for more than one half of the total quantity allotted.
In addition to the permanent base quantities allotted, the order established a base quantity reserve to be utilized for issuance of temporary base quantity certificates upon application therefor by new producers prior to May 15th of each year. Such base quantity reserve would, for the season 1963-64, be 2 1/2% of the total permanent base quantities and thereafter would be an amount not to exceed 2 1/2% of the said base quantities. Said temporary certificates could be renewed if the holder produced under them. After three successive years of production under a temporary certificate the holder is entitled to receive a permanent base quantity certificate equal to the average number of crates sold by him during the three years. Although permanent certificates are transferable, temporary certificates are personal to the holder and not transferable. No more than 25% of the 2 1/2% base quantity reserve may be assigned to any one applicant. Here it must be noted that the provision in the order for temporary certificates is without statutory authorization.
*725 It appears that the permanent base quantities allotted under the order are fixed and may be changed only by amendment to the order.
In determining the validity of legislation and orders of the kind involved here, the vital factor to be considered is the practical effect and impact thereof. Eskind v. City of Vero Beach, Fla. 1963, 159 So.2d 209, 212. The practical effect of this marketing order is to grant to the holders of the permanent base quantity certificates a virtual monopoly on the production and sale of celery, to deny any other persons the right to participate in this lawful enterprise on any reasonably large scale basis, and to deny others the right to participate at all.
As noted above, the permanent base quantity certificates are fixed on a basis of production and sales during the two seasons 1960-61 and 1961-62. The only way for a new producer to acquire a permanent certificate is to purchase an existing one or to obtain and operate under a temporary certificate for three years.
Moreover, the total quantity available for temporary certificates is uncertain, but in no event more than 2 1/2% of 7,710,842 or 192,762 crates. Since no temporary certificate may be issued for more than 25% of the base quantity reserve the most that any temporary certificateholder may be allotted is 48,190 crates. Assuming that any sizeable number of persons applied for such permits each would be limited to a smaller share of the base quantity reserve and some would (as in the instant case) be altogether prohibited from producing celery.
It is true that the statute apparently leaves it to the Commissioner to change the representative period by advancing the years or seasons selected as the base. But this would provide no real opening for new producers. The continued enforcement of the order would effectively prevent their ever achieving the production, during any subsequent period, that would qualify them for any large scale production or sale under a permanent certificate. For example, if the representative period were to be advanced from the 1960-61 and 1961-62 seasons to the 1964-65 season its only effect would be to grant to those temporary certificate producers in that year a permanent certificate for all or some portion of the meagre quantity of celery each was permitted to produce in that year. Those persons who did not produce under temporary certificates during the 1964-65 season (or in any other period chosen) would gain nothing by a change in the representative period.
It is inescapable that the effect of the marketing order is to draw an unjust and discriminatory distinction between those who were producers during the representative period and those who were not. Such a classification, for which we can find no justification in any legitimate public policy, amounts to an arbitrary exercise of the state's police power so as to constitute a taking of property without due process of law and a denial of equal protection of the law. So viewed, the marketing order is violative of Sections 1 and 12, Declaration of Rights, Florida Constitution and the Fourteenth Amendment to the United States Constitution. To the extent that it authorizes the unconstitutional result of the marketing order, Part I of ch. 573 is also invalid. Inasmuch as the marketing order seems to regulate only the producers of celery, no direct attempt to regulate handlers or distributors being made, the only provision of the statute specifically involved in this ruling is Sec. 573.17(1) (d).
In deference to the legislative authority we are required to uphold the act and the marketing order if there be any reasonable basis upon which to do so. Similarly, we are bound to hold to a minimum any judicial disturbance of the legislative product. For these reasons we do not decide the more basic question of whether the state, in the exercise of the police power, may or may not regulate the quantity of celery which may be sold by or handled for producers in this state. It is unnecessary that we do *726 so because as above stated we find the manner of regulation employed in the statute and the marketing order to be invalid for the reasons above stated.
It is pertinent to note here that the California statute from which ch. 573 appears to have been adapted not only does not authorize allotments on the basis of past production, but does not authorize any allotments which focus on the producer. Deering's California Codes: Agricultural, Sec. 1300.15 (1962). Thus, that statute contains no provision comparable to Sec. 573.17(1) (d), although it has provisions comparable to Sec. 573.17(1) (c) and (e).
No authority need be cited for the proposition that activity deemed inherently harmful to the public welfare may be prohibited, or that the state may establish rigidly controlled monopolies when the public interest warrants. But we find in the commercial production of celery no activity warranting its prohibition, nor has this activity the character of a public utility that would justify its treatment as a controlled monopoly. The cases refusing to permit this kind of interference in the pursuit of an ordinary and legitimate use of property, in the absence of a clear requirement of the public interest, are legion. The following are a few: Liquor Store v. Continental Distilling Corp., Fla. 1949, 40 So.2d 371; Town of Bar Harbor Islands v. Schlapik, Fla. 1952, 57 So.2d 855; Larson v. Lesser, Fla. 1958, 106 So.2d 188; Stadnik v. Shell's City, Inc., Fla. 1962, 140 So.2d 871; City of Miami Beach v. Seacoast Towers-Miami Beach, Fla.App. 1963, 156 So.2d 528.
The appellee does not contend that the production of celery directly affects the public interest. He argues, rather, that such regulation is essential to the economic health of the celery industry and that the health of this industry affects the economy of the state, the local governments where celery is grown, and the welfare of those persons employed in the industry. He points out that the number of producers has increased since the regulation commenced. He states that during the three seasons prior to the invocation of the order, the f.o.b. Florida price of celery was $1.42, $1.69 and $1.71 per crate, respectively, whereas in the three seasons under the order the price has risen to $3.47, $2.10 and $2.76 per crate, respectively. This illustrates well that the regulation has been of benefit to those permitted to produce celery, and is strong evidence in favor of a planned and controlled agricultural economy. Nevertheless, it does not overcome or satisfy the infirmities above described.
For the foregoing reasons we hold those portions of the marketing order and the statute which authorize and award allotments of base quantities on the basis of production in a prior representative period to be unconstitutional and void.
The decree appealed from is reversed and the cause remanded for further proceedings consistent with this opinion.
DREW, C.J., and THOMAS, ROBERTS, THORNAL, CALDWELL and HOBSON (Retired), JJ., concur.