**CHIGLADES FARM, LTD., et al.,**
**Plaintiffs-Appellants,**

v.

**Earl L. BUTZ, Secretary of Agriculture**
**of the United States of America, et al.,**
**Defendants-Appellees.**

**No. 72–3451.**

United States Court of Appeals,
Fifth Circuit.

Oct. 10, 1973.

---

19. 393 U.S. 233, 243–244, n. 6, 89 S.Ct. 414, 21 L.Ed.2d 402.

20. *Id.* at 243, n. 6, 89 S.Ct. at 419.

Nathan Lewin, Washington, D. C., Michael R. Storace, Miami, Fla., for plaintiffs-appellants.

Robert W. Rust, U. S. Atty., Robert Silverstein, Miami, Fla., M. W. Wells, Orlando, Fla., L. Patrick Gray, III, Asst. Atty. Gen., Judith S. Feigin, Walter H. Fleischer, Dept. of Justice, Washington, D. C., for defendants-appellees.

Before GOLDBERG, CLARK and RONEY, Circuit Judges.

RONEY, Circuit Judge:

Appellants have been trying since mid-1967 to do nothing more remarkable than grow and market celery in Florida, and this case concerns their heretofore unsuccessful efforts to achieve this modest goal.

This wailful preface to plaintiffs' brief would have bewildered the founders of this country. But so far are we now from the freedom of enterprise envisioned by those noble souls that the District Court's decision denying plaintiffs the right to sow, reap and sell must be affirmed. More precisely, plaintiffs may sow and reap all the celery they wish, but they cannot sell, because the market is regulated by federal law and they have been regulated out. We agree with the District Court that the federal administrative order which denied plaintiffs a share of the celery market is both lawful and constitutional.

To regulate the marketing of celery grown in Florida, the United States Secretary of Agriculture issues "base quantities," or market shares, to eligible producers. Plaintiffs, having been denied a market quota, brought this action to compel the Secretary to issue Chiglades Farm, Ltd., a base quantity. Alternatively, plaintiffs challenge the marketing system as exceeding the Secretary's statutory authority, as being unconstitutional, and as violating the antitrust laws. Jurisdiction was invoked under 28 U.S.C.A. § 1331(a) [federal question]; 28 U.S.C.A. § 1361 [to compel a federal officer to perform his duty]; 5 U.S.C.A. § 701 et seq. [judicial review of administrative rulings]; and 15 U.S.C.A. § 4 [antitrust]. The District Court, by summary judgment, held that Chiglades is not entitled to a base quantity and that the Marketing Order is both lawful and constitutional. We affirm.

## The Statutory Program

The Agricultural Marketing Agreement Act, 7 U.S.C.A. § 601 et seq., is designed to establish and maintain orderly marketing conditions for agricultural commodities in interstate commerce. Both to prevent unreasonable price fluctuations and to maintain parity prices, the Act authorizes the Secretary of Agriculture to promulgate marketing orders regulating "handlers" of specified agricultural commodities, including celery. 7 U.S.C.A. § 608c(3), (4).[1] Such orders may provide methods for the limitation of a commodity. Market shares are required to be determined subsequently by a "uniform rule" embracing the production history of each producer.

Pursuant to this Act, the Secretary issued Marketing Order No. 967, 30 Fed. Reg. 14266 (1965), to stabilize the Florida celery market through annual allotments establishing the maximum amount of celery each handler might purchase. For its administration, Marketing Order 967 created the Florida Celery Committee, composed of producers, handlers,

---

[1] "Handlers" are defined in the Act as "processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof" specified in the Act. 7 U.S.C.A. § 608c(1).

and their employees, nominated by groups from different regions of the State. 9 C.F.R. §§ 967.25, 967.26, 967.-28. Each season, the Committee recommends the total amount of celery to be handled, and the Secretary, if necessary, may impose marketing limits to insure the season's "marketable quantity." 7 C.F.R. §§ 967.35(a), 967.36(a), 967.13.

Following promulgation of the Order in 1965, each producer was required to register with the Committee and to furnish its sales history since 1958. Producers with no sales during this period were entitled to inclusion if they made "firm and substantial" commitments to produce celery and were engaged in its production prior to September 30, 1965. 7 C.F.R. § 967.37(b). From this data, a "base quantity" was determined.

Marketing Order No. 967 was the result of the Florida Supreme Court's holding in Rabin v. Conner, 174 So.2d 721 (Fla.1965), that a state celery marketing order was violative of the State and federal constitutions. Utilizing his rule-making power under the Agricultural Marketing Agreement Act, the Secretary of Agriculture adopted Marketing Order No. 967, similar in many respects to the State order.

### The Facts

Chiglades Farm, Ltd. is a limited partnership, of which Leo Bramson and Marvin Welfeld are general partners, organized in 1962 to grow celery in a joint venture with A. J. Sullivan of Florida, Inc., a Florida corporation. Ansel J. Sullivan, one of the principals in the corporation bearing his name, was a long-time Florida celery producer and was allocated in 1962 a "base quantity"

under the state marketing system. The Joint Venture Agreement provided that the quota held personally by Sullivan would be transferred to the Sullivan corporation, which would receive twenty percent of the net profits and bear no losses. Chiglades was to lease the land, contribute $75,000 for the production of celery, bear any losses, and be entitled to eighty percent of the net profits.

Eugene McCabe, a veteran of the Florida produce business and a member of the Florida Celery Committee, initiated the business venture and was an organizer of the Sullivan corporation. He was also the principal officer of Pioneer Land Company, which leased the farm land to the joint venture, and Pioneer Growers Corporation, which marketed the joint venture's celery. All records and payments involving the cooperative were in the name of the Sullivan corporation, despite the Joint Venture Agreement's requirement that the operating bank account be in the joint venture's name.

In 1965, Ansel Sullivan died, the Florida Supreme Court ruled the state marketing system unconstitutional, and the federal plan was initiated. Pursuant to the new marketing order's registration requirements, the Sullivan corporation, not Chiglades, applied for and received a quota based on its past production history. Chiglades and Sullivan, Inc. then entered into a new Joint Venture Agreement, reciting that the Sullivan corporation had applied for a federal quota under which the joint venture would operate.

The joint venture was terminated in June, 1967.[2] Chiglades filed with the

2. Throughout this litigation, plaintiffs have alleged extensive illegal and unethical conduct by McCabe. According to their account of the facts, McCabe suggested the joint venture to Bramson and offered to "resurrect" Ansel Sullivan's celery quota. McCabe, personally and through Horace Unwin, the bookkeeper of Pioneer Growers Cooperative and A. J. Sullivan of Florida, Inc., then arranged the joint venture's affairs to his best interest.

The operation of the venture was left practically entirely to McCabe. Contrary to the Joint Venture Agreement, its bank account was under the Sullivan corporation's name. McCabe and Unwin obtained control of the Sullivan corporation without informing any of the Chiglades partners; and after the federal quota system was introduced, McCabe urged Bramson that application for a base quantity should be in the Sullivan corporation's name. Although he abstained from voting,

Florida Celery Committee an application for a new base quantity to be awarded from any reserve established by the Secretary of Agriculture. The application, on the form designed for producers who have no record of celery sales during the base period, listed the joint venture's production history as its own, and no reference was made to the Sullivan corporation. The following month, the application was denied, and similar efforts seeking a "reserve" base quantity in May, 1969 and 1970, proved unsuccessful after the Secretary determined that no marketing reserve would be established in those years.

In May, 1969, Chiglades filed a quota application based on its alleged production history during the joint venture. After a hearing, both the Department of Agriculture examiner and the Florida Celery Committee concluded that Chiglades was not entitled to credit for the base quantity issued to the Sullivan corporation. The Secretary of Agriculture upheld this decision on the ground that the limited partnership never produced celery in its own capacity and that the Marketing Order, both as promulgated and as applied, is within the purposes of the Act and is constitutional.

The District Court held that the Secretary's award of a base quantity to Sullivan, Inc., rather than to Chiglades, was supported by substantial evidence and that, in view of market demands, the Secretary was justified in refusing to issue Chiglades a new quota. The Court held that the Marketing Order was both a proper exercise of the Secretary's statutory authority and constitutional and that the antitrust laws had not been violated since 7 U.S.C.A. § 608b specifically provides that marketing agreements shall not be held violative of any antitrust laws.

*The Base Quantity Assignment*

Plaintiffs contend that between 1962 and 1965, Chiglades was the sole "producer" of celery under the joint venture, that it is therefore entitled to the Sullivan corporation's base quantity or the allocation of a new quota, and that the District Court erred in concluding that the Secretary's refusal to issue a quota was based on substantial evidence.

■■  Review of administrative proceedings under the Agricultural Marketing Agreement Act is limited by 5 U.S.C.A. § 706.[3] The District Court properly confined itself to a determination of whether the decision rendered by the Secretary was supported by substantial evidence. *See* 5 U.S.C.A. § 706(2)(E); Watson v. Gulf Stevedore Corp., 400 F.2d 649, reh. denied, 404 F.2d 1059 (5th Cir.), cert. denied, 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1968); Lewes Dairy v. Freeman, 401 F.2d 308 (3rd Cir.), cert. denied, 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1968). The District Court observed that the following

McCabe also was one of the five members of the Florida Celery Committee's Marketing Subcommittee which issued the base quantity in 1965 to the Sullivan corporation. As this statement of facts relates, the joint venture was terminated when Bramson first learned of McCabe's personal interest in the Sullivan corporation.

These allegations, depicting the subject events in light of McCabe's self-dealing, are not central to the issues posed by this appeal and were addressed by two state actions filed by Chiglades. In the first, brought on the theory that McCabe owed a fiduciary obligation to the partnership, summary judgment was granted for McCabe on the ground that a limited partner has no fiduciary duty to the partnership. The second action, to compel the Sullivan corporation to proceed with the joint venture by permitting the base quantity to be used by Chiglades on land other than that owned by the Pioneer Land Company, was terminated by voluntary dismissal. A final order of dissolution of the Chiglades partnership, at McCabe's initiative, was entered on April 21, 1970.

3.  5 U.S.C.A. § 706 provides the following scope of review:
To decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.

facts tended to substantiate the Sullivan corporation's claim to the base quantity:

1. Sullivan, Inc. possessed a base quantity under the Florida regulation which was subsequently held unconstitutional.

2. A. J. Sullivan had a long history as a producer of celery in Florida.

3. The payroll bank account of the joint venture was in Sullivan, Inc.'s name, but all money deposited in it came from the account maintained by the joint venture.

4. Pioneer Growers Cooperative, which was the handler for the celery grown by the joint venture maintained its accounts only in the name of Sullivan, Inc., and made payments directly to Sullivan, Inc. It should be borne in mind, however, that Pioneer Growers Cooperative was aware that it was in effect handling celery for the joint venture, since E. A. McCabe was an officer of Pioneer Growers Cooperative, and was also an officer of Pioneer Land Co. which leased the land to Chiglades for the purpose of growing celery under a joint venture agreement with Sullivan, Inc. And although money was paid directly to Sullivan, Inc., it was then transferred into the account maintained by the joint venture for distribution.

5. When Order No. 967 was first promulgated, it was Sullivan, Inc., and not Chiglades nor the joint venture that made application to the Florida Celery Committee for a base quantity.

6. The joint venture agreement provided that Sullivan, Inc. was to obtain a base quantity, and no mention was made as to a base quantity being taken in the name of or owned by the joint venture.

Chiglades' claim rests on the following evidence:

1. Chiglades was the dominant contributor to the joint venture and was entitled to a substantially greater share of the profits than Sullivan, Inc.;

2. All the land used for the production of celery was leased by Chiglades from Pioneer Land Co.;

3. All initial funds for operation of the joint venture were supplied by Chiglades;

4. Sullivan, Inc. originally supplied the equipment, but Chiglades was to be responsible for all additional equipment needed. After A. J. Sullivan's death, Chiglades purchased all the equipment from his estate; and so Chiglades eventually owned all the farming equipment;

5. All losses incurred by the joint venture were to be borne in full by Chiglades. The 1962 agreement provided that profits were to be divided 80 percent to Chiglades and 20 per cent to Sullivan, Inc. The 1965 agreement divided profits 92½ per cent to Chiglades and 7½ per cent to Sullivan, Inc. A. J. Sullivan was to assign all his shares in Sullivan, Inc. to Chiglades as a pledge for his performance under the Joint Venture Agreement, but he never did so.

Weighing these facts, the District Court concluded that the Secretary's decision that the base quantity should remain with the Sullivan corporation was neither arbitrary, capricious, nor unsupported by substantial evidence. We agree.

*First*, Chiglades was not clearly a producer under the Marketing Order's definition or within its criteria for entitlement to a base quantity. Under the Marketing Order,

"Producer" means any person who grew or grows celery in the production area in a proprietary capacity. The person with the right to sell celery so that handlers may purchase from such person or may handle on such person's behalf is in fact a producer. In sharecropping arrange-

ments, such person receiving a share of the crop with authority to pass title thereon is a producer of the celery he owns. A renter with full right to dispose of a celery crop by passing clear title is a producer.

30 Fed.Reg. at 13710.

The Sullivan corporation made all sales, received all proceeds, supplied most equipment, and made production commitments for the partnership. Chiglades neither had any history of celery production in the 1965–1966 or earlier seasons nor had made, prior to September 30, 1965, any "firm and substantial" commitments for such production, as required for designation as a "producer" under the Order. 7 C.F.R. § 967.37. We find no support for extending to a limited partnership or its partners the characteristics required to meet the Marketing Order's definition of "producer."[4]

*Second,* the same factors which support the Secretary's finding that Chiglades did not qualify as an independent producer in 1965 also provide substantial evidence for the determination that Chiglades did not have a history of celery production in prior seasons. In fact Chiglades was not in existence during some of the years considered in granting the quota to the Sullivan corporation.

*Third,* there is no evidence to show that Chiglades sought to assert any claims to producer status in 1965 when the Sullivan corporation was awarded its base quantity. Applicants for a base quantity in the initial 1965–1966 season were required to file by December 20, 1965, a deadline not met by plaintiffs.[5] Only after dissolution of the joint venture did Chiglades first assert a proprietary interest in the celery. We can only

conclude from these facts that Chiglades determined in 1965, under a theory or pretext irrelevant to this suit, that the Sullivan corporation's obtaining a quota for the joint venture would be in the limited partnership's best interests.

*Fourth,* under the terms of the Joint Venture Agreement, the base quantity was retained by the Sullivan corporation and never passed either to Chiglades or the limited partnership.

*Fifth,* since plaintiffs seek issuance of a new quota if it is determined that the Sullivan corporation is entitled to the one in question, we are directed to the Marketing Order's provisions for reserve quotas. 7 C.F.R. § 967.37(d)(1). The District Court found that "[s]ince present and past demand for celery has been limited, an increase in the total base quantities for the industry [permitting issuance of a reserve quota] is currently unwarranted," and the Secretary's refusal to grant one met the substantial evidence standard.

### *Conformity With the Agricultural Marketing Agreement Act*

■ Plaintiffs' contention that Marketing Order No. 967 is invalid because it exceeds the authority granted the Secretary of Agriculture by the Agricultural Marketing Agreement Act rests on three premises: (1) the Marketing Order assigns production quotas rather than regulating distribution as authorized by the Act, (2) the allocation method is unreasonable, and (3) the base quantity system excludes new growers from the industry. Finding no merit to any of these arguments, we find the Marketing Order to be a valid exercise of the Secretary's statutory authority.

---

4. To demonstrate its "proprietary capacity," Chiglades relies on irrelevant authority. *See, e. g.,* Owen v. Comm'r, 192 F.2d 1006 (5th Cir. 1951), and Irrgang v. Fahs, 94 F. Supp. 206 (S.D.Fla.1950) [involving the taxation of gains from sales of unsevered fruit]; Adams v. Adams, 158 Fla. 173, 28 So.2d 254 (1946) [involving estate problems relating to citrus crops].

5. Plaintiffs argue that they had been supplied the wrong forms and allege that McCabe's deceits were responsible for the continued reliance on the Sullivan corporation for a base quantity. These contentions are not responsive to the Secretary's requirement that all past or current producers in 1965 themselves apply under the new federal marketing system.

*First*, the District Court noted that, notwithstanding the exemption of producers from regulation, 7 U.S.C.A. § 608c(13)(B), "[w]hen the Secretary formulates a rule based upon prior production history as to the amount each handler may handle from each producer, a scheme of quotas arises whereby the producer is as regulated as a handler." The Court sanctioned such indirect regulation, however, on the ground that § 608c "does not actually regulate producers *in their capacity as producers.*"

To justify the Marketing Order, the Secretary of Agriculture distinguished between the permissible regulation of the amount which a producer may sell to a handler and the prohibited regulation of the amount a producer may grow. Although no appellate court decisions concerning this distinction's application to the Agricultural Marketing Agreement Act have been brought to our attention, the Supreme Court has found such a distinction valid under the Agricultural Adjustment Act. In Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L. Ed. 1092 (1939), where petitioners challenged marketing quotas apportioned to tobacco farms subject to penalties on warehousemen who marketed tobacco in excess of any farm's quota, the Court, upholding the regulatory system, found that "[t]he statute does not purport to control production. It sets no limit upon the acreage which may be planted or produced and imposes no penalty for the planting and producing of tobacco in excess of the marketing quota." 307 U. S. at 47, 59 S.Ct. at 652.

Similarly, the Florida celery producer is not limited to growing any maximum amount. It is only the marketing of his produce that is regulated and that is the precise statutory objective of the Agri-

cultural Marketing Agreement Act, under which the Celery Marketing Order was promulgated. It cannot be said, therefore, that the Secretary of Agriculture exceeded his authority in promulgating an order affecting production only indirectly while regulating the industry's marketing.

*Second*, plaintiffs argue that, contrary to the dictates of 7 U.S.C.A. § 608c (6)(B)[6] that base quantities be apportioned "equitably among producers", the Marketing Order provisions for the allocation of quotas according to production history are based on unrepresentative periods. A similar contention was rejected by the Supreme Court in Sec'y of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 70 S.Ct. 403, 94 L.Ed. 381 (1950), where the Court upheld the Secretary's allotment of sugar quotas under the Sugar Act of 1948, 7 U.S.C.A. § 1100 et seq.

In *Central Roig Refining Co.*, the Court examined another quota system founded on past market share and acknowledged that "[fixing] quotas on a strict historical basis is hard on latecomers into the industry . . . ." 338 U. S. at 617, 70 S.Ct. at 410. But the Court concluded that

since Congress fixed the quotas on a historical basis it is not for this Court to reweigh the relevant factors and, perchance, substitute its notion of expediency and fairness for that of Congress. This is so even though the quotas thus fixed may demonstrably be disadvantageous to certain areas or persons. This Court is not a tribunal for relief from the crudities and inequities of complicated experimental economic legislation.

338 U.S. at 618, 70 S.Ct. at 410.

6. Allotting, or providing methods for allotting, the amount of such commodity or product, or any grade, size, or quality thereof, which each handler may purchase from or handle on behalf of any and all producers thereof, during any specified period or periods, under a uniform rule based upon the amounts sold by such producers in such prior period as the Secretary determines to be representative, or upon the current quantities available for sale by such producers, or both, to the end that the total quantity thereof to be purchased, or handled during any specified period or periods shall be apportioned equitably among producers. 7 U.S.C.A. § 608c(6)(B).

The celery marketing system does not employ a rigid historical base period. Congress specifically provided that allotments may be based, at the Secretary's discretion, upon the amounts sold by producers in such period as the Secretary determines to be representative or upon the current quantities available for sale or both. *See* 7 U.S.C.A. § 608c(6)(B). As noted above, producers with no sales during the period determined to be representative are entitled to base quantities if they made "firm and substantial production commitments and were engaged in production prior to a designated date." 7 C.F.R. § 967.-37(b).

*Third,* the base quantities are not, as plaintiffs allege, "perpetual transferrable licenses" which operate to preclude entry of new producers into the industry. New producers may obtain quotas in either of two ways: (1) producers, with the Celery Committee's approval, may transfer all or part of their allotments, *see* 7 C.F.R. § 967.39, and (2) new quotas may be issued from the reserve amount established by the Secretary of Agriculture in any season, *see* 7 C.F.R. § 967.37(d)(1). Only the Secretary, not the present producers or their marketing committee, has the power to preclude entry of new growers in the industry. 7 C.F.R. §§ 967.37(d)(1), 967.-37(d)(3).

Admittedly, no reserve quotas have been issued since promulgation of the Order, but the Secretary contends that his refusal to issue a new quota is consistent with the objectives of the Agricultural Marketing Act since there has been no increased demand for celery. Furthermore, if he deems the Marketing Order not to be in furtherance of the Act's policy, he is empowered to terminate the program. 7 U.S.C.A. § 608c(16)(A). Thus, the Order does not preclude entry of new producers into the industry and does not confer "perpetual licenses" on any group of producers.

### Constitutional Questions

Plaintiffs argue that (1) Marketing Order No. 967 is unconstitutional for the reasons the Florida Celery Order was struck down in Rabin v. Conner, *supra,* and (2) they were deprived of due process by the composition and authority of the Florida Celery Committee. Neither of these constitutional claims is valid.

■ *First,* although the Florida Celery and Sweet Corn Marketing Law, Ch. 573, F.S.A. (1959) found unconstitutional by the Florida Supreme Court in *Rabin,* was similar in objectives and mechanics to the federal Marketing Order, there is one crucial difference. Under the Florida system, permanent base quantities could be changed only by amending the orders. Reserve quotas not to exceed 2½% of the permanent allotments could be issued to new producers each year, but no producer could be assigned more than 25% of the 2½% total reserve amount. Only after three successive years of production under reserve quotas could a new producer be issued a permanent base quantity, and that would be equal to the average number of crates sold by him during his production years.

Thus, it was impossible for a new producer ever to be assigned a quota competitive in volume with older producers. The Florida Court, viewing the system as an arbitrary exercise of the State's police power, reasoned that

[i]t is inescapable that the effect of the marketing order is to draw an unjust and discriminatory distinction between those who were producers during the representative period and those who were not. Such a classification, for which we can find no justification in any legitimate public policy, amounts to an arbitrary exercise of the state's police power so as to constitute a taking of property without due process of law and a denial of equal protection of the law. So viewed, the marketing order is viola-

tive of Sections 1 and 12, Declaration of Rights, Florida Constitution and the Fourteenth Amendment to the United States Constitution.

174 So.2d at 725. The federal regulatory system has no such impediment to a new producer's gaining a share in any increase in the celery market.

In view of the aforementioned distinction between the Florida and federal systems, the Florida ·Supreme Court's reasons for finding the state plan unconstitutional do not pertain to the case at bar. Moreover, the Florida court did not decide "the more basic question of whether the state, in the exercise of the police power, may or may not regulate the quantity of celery which may be sold by or handled for producers . . . ." The court concluded that it was "unnecessary that we do so because . . . we find the manner of regulation employed . . . to be invalid . . . ." 174 So.2d at 725–726. Thus, plaintiffs can find no broader constitutional support for their position in Rabin v. Conner, *supra*. .

■ *Second*, plaintiffs complain that the composition of the Florida Celery Committee vests control of the industry in a group of self-interested producers and.thereby deprives them of due process of law. It is argued that, despite the Secretary's ultimate authority, he exercises no independent judgment. The District Court agreed that "their motivation, at least in part, stems from self-interest," but noted that it is the Secretary

1. Who actually selects committee members.

2. To whom recommendations and complaints are made.

3. Who limits the total celery to be handled during a marketing season.

4. Who sets aside a reserve for those persons who desire to increase their base quantity or who have no base quantity.

5. Who issues other regulations to effectuate the policy of the marketing order.

6. Who hears and passes on all appeals from orders of the Florida Celery Committee.

The Court concluded, therefore, that the checks on the Committee's powers are effective, and we agree.

Congress has approved the use of such producer-controlled committees on the theory that the most sound decisions will result from permitting those in the area with the greatest knowledge of the industry's needs to make recommendations to the Secretary. *See, e. g.*, Sen.Rep. No. 566, 87th Cong., 1st Sess., p. 39, 2 U.S.C.C.A.N., 87th Cong., 1st Sess., pp. 2243, 2281. This Court, upholding producer committees in the citrus industry in Whittenburg v. United States, 100 F. 2d 520 (5th Cir. 1939), found that

[a]ction taken is always that of the Secretary. These others [producers] gather and present information to give him a broader view of the situation. Their concurrence gives his action support and tends to assure its enforcement. But they have no actual power.

100 F.2d at 523.

We recognize that McCabe, whom plaintiffs portray as the culprit in their lack of success, is a member of the Florida Celery Committee and this fact highlights the potential for abuse that is implicit in any self-regulatory body. McCabe, nevertheless, abstained from voting on the Chiglades application for a base quantity, and any arbitrariness of the Committee's decisions fails to meet constitutional dimensions.

### *Antitrust Problems*

■ Under 7 U.S.C.A. § 608b,

The making of any such [marketing] agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful.

Plaintiffs maintain that, insofar as Marketing Order No. 967 exceeds its statutory authority, this antitrust immunity is inapplicable. Having found no abuse of authority, however, we must conclude that the immunity is undisturbed. Where such total immunity is granted, there can be no violation of the antitrust laws. *See* Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973).

Affirmed.