WILEMAN BROS. & ELLIOTT, INC., Frank Thomas Elliott, Jr., dba Elliott Farms, Frank Thomas Elliott III, Kash, Inc., Rodney Chang, and Edward Ogawa, Plaintiffs–Appellants,

v.

Leroy GIANNINI, Giannini Packing Corporation, Virgil Rasmussen, Ballantine Produce Co., Inc., Patrick Pinkham, and Gary Van Sickle, Defendants–Appellees.

No. 88–15731.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 1990.

Decided July 10, 1990.

Thomas E. Campagne, Fresno, Cal., for plaintiffs-appellants.

Mark E. Cullers, Asst. U.S. Atty., Fresno, Cal., for defendants-appellees.

Before WIGGINS and NOONAN, Circuit Judges, and TASHIMA,* District Judge.

---

\* Honorable A. Wallace Tashima, United States District Judge for the Central District of California, sitting by designation.

1. These facts regarding committee involvement are not alleged in the complaint, but they are conceded in appellant's opening brief.

TASHIMA, District Judge:

## BACKGROUND

Appellants (plaintiffs) are growers of nectarines and plums who also pack, ship, and market their fruit and that of other growers. Under the Agricultural Marketing Agreement Act of 1937 (the "Act"), 7 U.S.C. § 601 *et seq.*, therefore, they are both "producers" and "handlers." 7 U.S.C. § 608c(1). Appellees (defendants) are nectarine and plum producers who compete with plaintiffs, and who served either as members of administrative committees appointed by the Secretary of Agriculture (the "Secretary") pursuant to his authority under the Act, 7 U.S.C. § 610(b)(1), or as employees of such a committee.[1] The composition, duties, and powers of these committees are set forth in marketing orders issued by the Secretary based on marketing agreements with the handlers and subject to a referendum of producers. Under these orders, regulations such as those at issue in this case—governing the size and grade of fruit—may be promulgated by the Secretary upon a finding that such regulations will tend to effectuate the policies of the Act.

The complaint alleges that beginning in 1980, defendants substituted heightened standards for the "maturity" required of each variety[2] of plums and nectarines before it could be picked. They issued and enforced a "well-matured" standard, without authorization from the Secretary, to improve their own profitability and diminish the earnings of plaintiffs. Pursuant to this standard, a system of color chips (ranging from fairly green to bright yellow) and descriptive tables, enabled defendants to require some varieties to remain on the tree longer. This was accomplished through the committees established by the Secretary, an agency established by the committees (the California Tree Fruit Agreement), employees of the committees,

---

2. Santa Rosa plums, for instance, are one variety. There are over 95 varieties of plums and over 80 varieties of nectarines subject to these regulations.

and the Federal–State Inspection Service. In addition to discriminating against the varieties of nectarines and plums grown by plaintiffs, defendants discriminated against plaintiffs by refusing to grant color variances which were granted to producers favored by defendants. By requiring yellower colors, defendants constricted supply during certain parts of the season, capturing for themselves the "marketing windows" in which tree fruit commanded premium prices, and causing significant losses to plaintiffs in wasted fruit and reduced revenues.

This action was brought in California state court under the Cartwright Act, the state antitrust statute. Cal.Bus. & Prof. Code § 16700, *et seq.* Defendants removed the action to federal court. The district court granted defendants' motion to dismiss the action on the basis of: (1) an antitrust exemption in the Act, 7 U.S.C. § 608b; and (2) approval of defendants' activities by the Secretary. This appeal followed. The district court's jurisdiction was based on 28 U.S.C. § 1442(a)(1). We have jurisdiction under 28 U.S.C. § 1291.

Prior to filing this action, plaintiffs sued the Secretary directly, seeking injunctive relief. That action was dismissed for failure to exhaust administrative remedies, and an appeal, still pending, was taken.[3] Plaintiffs, concurrently with the instant action, are now pursuing their administrative remedies under the Act.

## STANDARD OF REVIEW

Dismissal for failure to state a claim is reviewed *de novo, Massey v. Inland Boatmen's Union,* 886 F.2d 1188, 1189 (9th Cir.1989), assuming the truth of all factual allegations made by the plaintiff, *Shah v. County of Los Angeles,* 797 F.2d 743, 745 (9th Cir.1986).

**3.** *Wileman Bros. & Elliott, Inc. v. Lyng,* Ninth Circuit No. 87–2938.

**4.** *Borden's* inclusion of marketing orders may be dicta; the opinion also seems to leave open the issue it purports to decide.

## ANALYSIS

### I. Absolute Immunity Under Section 608b.

The purpose of the Act is to regulate the prices of agricultural commodities to assure farmers a reasonable standard of living. 7 U.S.C. § 602(1). The Act provides for marketing orders as the means by which the Secretary is to promulgate regulations. Such an order becomes effective when two-thirds of the producers approve it by referendum, and when either (1) a majority of handlers (by volume of business) sign a marketing agreement, 7 U.S.C. § 608c(8), or (2) the Secretary determines that the refusal or failure of handlers to sign such an agreement tends to prevent the effectuation of the policy of the Act, and that issuance of the order is the only practical means of advancing the interests of producers, 7 U.S.C. § 608c(9). To prevent antitrust suits against handlers who signed marketing agreements—arguably agreements in restraint of trade—Congress exempted such agreements from the antitrust laws.

> [T]he Secretary of Agriculture shall have the power ... to enter into marketing agreements.... The making of any such agreement shall not be held to be in violation of any of the antitrust laws of the United States, and any such agreement shall be deemed to be lawful: *Provided,* That no such agreement shall remain in force after the termination of this chapter.

7 U.S.C. § 608b. Although by its terms this immunity does not extend to collective activity undertaken by handlers or producers other than marketing agreements, it may in some cases reach activity directed by the Secretary through marketing orders. *See United States v. Borden Co.,* 308 U.S. 188, 201–02, 60 S.Ct. 182, 189–90, 84 L.Ed. 181 (1939) (immunity for activity "validly agreed upon or directed by the Secretary").[4]

An agreement made with the Secretary as a party, or an order made by him, or an arbitration award or agreement approved by him, pursuant to the authority conferred by the Agricultural Act *and within the terms of the described immunity,* would of course be a defense to a prosecution under the Sherman Act to the

Any immunity for actions directed by marketing orders extends only to "such qualified authorization and such requirements as they contain." *Borden,* 308 U.S. at 198, 60 S.Ct. at 188; *accord Berning I,* 643 F.Supp. at 29 (committee members "immune for acts committed within their statutory authority"). The Secretary's interpretation of the statute is consistent with *Borden.* In guidelines jointly prepared by the Department of Agriculture and the Department of Justice for the benefit of members and employees of all marketing order committees, those agencies clearly limited this immunity:

> The exemption provided committee members and employees from antitrust prosecution is limited to those acts within the confines of their official committee obligations, as defined by terms of the marketing order and regulations issued pursuant to the Agricultural Marketing Agreement Act of 1937. Conduct that falls outside the range of activities authorized by the Federal marketing order regulations may be subject to antitrust prosecution.

*Guidelines for Compliance with the Antitrust Laws* 4 (unpublished manuscript date stamped July 13, 1982); *see also* 7 C.F.R. § 989.801 (1989) ("Members and employees of the Raisin Administrative Committee are immune from prosecution under the United States antitrust laws only insofar as their conduct in administering the Raisin Marketing Order is authorized by the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. 601 *et seq.,* or the provisions of the order."). The immunity provided by section 608b thus is not absolute as a matter of law.[5]

■ The record on this motion to dismiss permits review only of the marketing orders themselves. Absent authority therein for raising maturity standards, the judgment must be reversed.

In May 1980, the Secretary published Nectarine Regulation 12 and Plum Regulation 16, amending the respective marketing orders. Both provided that the fruit must grade at least U.S. No. 1 and, for the first time, that "maturity shall be determined by the application of color standards by variety or such other tests as determined to be proper by the Federal or Federal–State Inspection Service." Nectarine Reg. 12, 45 Fed.Reg. 32,308 (1980) (to be codified at § 916.354(b)(1)); Plum Reg. 16, 45 Fed.Reg. 33,596 (1980) (to be codified at § 917.453(a)).[6] This new language govern-

---

extent that the prosecution sought to penalize what was thus validly agreed upon or directed by the Secretary. Further than that the Agricultural Act does not go.

308 U.S. at 201–02, 60 S.Ct. at 189–90 (emphasis added). Marketing orders are *not* within the express language of section 608b.

Courts explicitly considering the issue have disagreed on whether orders fall within the immunity provision. *Compare In re Midwest Milk Monopolization Litig.,* 380 F.Supp. 880, 885–86 (W.D.Mo.1974) ("untenable" to extend 608b to orders) *with Berning v. Gooding,* 643 F.Supp. 26, 29 (D.Or.1985) (*"Berning I"*) (order based on committee recommendation resembles agreement), *aff'd on other grounds,* 820 F.2d 1550 (9th Cir.1987) (*"Berning II"*). The court assumes without deciding that *Borden* correctly states the law.

5. The nectarine and plum orders limit committee members' personal liability. 7 C.F.R. §§ 916.70, 917.68 (1989). These provisions generally preclude liability for negligence, while permitting suits for "acts of dishonesty." However, they do not explicitly mention antitrust liability, and they could not reach so far because they can provide no greater immunity

than the Act itself. Moreover, a virtually identical provision exists in the raisin order. *See* 7 C.F.R. § 989.85. If the personal liability provision excluded antitrust liability, then the provision detailing committee members' antitrust immunity would be superfluous. This strongly implies that the nectarine and plum provisions also were not intended to reach antitrust liability.

6. Assuming that there was authority for the establishment of higher maturity standards, plaintiffs argue that such authority was in the inspection service and not in the committees. Because the regulation does not speak of establishing standards, but only of determining the propriety of tests to determine maturity, the express delegation of those tasks to the inspection service does not resolve the question. The regulations do not support the view that a standard-setting role was assigned to the inspection service.

The committees are empowered to "make such rules and regulations ... as may be necessary to effectuate the terms and provisions of [the marketing order]." 7 C.F.R. § 917.35(b); 7 C.F.R. § 916.30(c). Such rules and regulations

ing standards and tests is ambiguous as to whether the maturity standards themselves were being or would subsequently be modified and, if so, by whom. No other language in the regulations supports departing from the basic maturity standard: that stage of growth at which, after picking, the fruit will ripen properly. *E.g.*, 7 C.F.R. §§ 2851.1530, 2851.3153 (1980).

The regulations amending the marketing order did not remove existing limits on the authority of committees to change maturity standards. The marketing order provides that the Secretary may issue regulations upon the recommendation of the administrative committees:

> Such regulations may: (1) Limit, during any period or periods, the shipment of any particular grade, size, quality, *maturity*, or pack, or any combination thereof, of any variety or varieties of nectarines grown in the production area; (2) Limit the shipment of nectarines by establishing, in terms of grades, sizes, or both, minimum standards of quality and *maturity* during any period when season average prices are expected to exceed the parity level
>
> . . . .

7 C.F.R. § 916.52(a) (emphasis added); 7 C.F.R. § 917.41(a) (plums). The provision for committee recommendations provides that: "Whenever the committee deems it advisable to regulate the handling of any variety or varieties of nectarines in the manner provided in § 916.52, it shall so recommend to the Secretary." 7 C.F.R. § 916.51(a); 7 C.F.R. § 917.40(a). These sections require that "whenever" the committee seeks to impose particular maturity standards, it does so only through recommending those standards to the Secretary.[7]

The "supplementary information" published with the regulations in the Federal Register may support defendants' position. The findings accompanying the Plum Regulation state that "[t]he grade and size regulation specifies a minimum grade of U.S. No. 1 for all varieties of plums except that provision is made for a higher maturity standard." 45 Fed.Reg. at 33,596. A similar finding was made with respect to the Nectarine Regulation. 45 Fed.Reg. 45,252 (1980) (first amended order). The phrase "provision is made" is, unfortunately, less than precise. Arguably, it suggests activity beyond merely the determination of tests for maturity, and envisions decisions by actors to whom the Secretary has delegated authority since he would not have to make any such provision for regulations he intended to issue himself. As demonstrated above, however, the regulations do not effectuate this supposed intent. The court cannot rely on this vague suggestion of intent to rationalize or disregard the clear language of the regulation. "The language of a regulation or statute is the starting point for its interpretation. [ ] The plain meaning governs unless a clearly expressed legislative intent is to the contrary, [ ] or unless such plain meaning would lead to absurd results." *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir.1987). Here there is neither a clearly expressed contrary regulatory intent nor an absurd result.

■ Defendants were not authorized by these regulations to promulgate and enforce higher maturity standards. Absent authorization in some other form, defendants are not immune from suit under section 608b with respect to this activity.[8]

7. Higher maturity standards are not the type of ministerial or facilitative regulations that "effectuate the terms and provisions" of the marketing orders. The requirement that changes in maturity standards be recommended to the Secretary forecloses the interpretation that the provision for administrative regulations was intended to embrace such changes.

8. Defendants contend that plaintiffs are collaterally estopped from contending that the standards were not authorized because Judge Price decided that issue adversely to plaintiffs in the

need not be approved, but may at any time be declared null and void by the Secretary. 7 C.F.R. §§ 916.62, 917.30. Conversely, the inspection service certifies that fruit complies with regulations issued by the Secretary. 7 C.F.R. §§ 916.55, 917.45. Based on the limited role of the inspection service in the scheme of the marketing orders, the 1980 regulations should not be interpreted to place standard-setting authority in those services. The revised regulation merely authorizes the inspection services to apply the maturity standards developed by other actors.

The court need not reach plaintiffs' contention that *Carter v. Carter Coal Co.*, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), bars delegation of "law-making" by the Secretary to a committee of competitors, since no such delegation has been established in the record. Nor does the non-delegation doctrine necessarily foreclose a finding that the Secretary indeed did authorize defendants to do what they did. Further consideration of the continuing vitality of that doctrine,[9] and its effect on this action, should await a more fully developed record.[10]

## II. Secretarial Non–Disapproval

■ In *Berning v. Gooding*, 820 F.2d 1550 (9th Cir.1987) (*"Berning II"*), this court held that members of the Hop Administrative Committee could not be liable for treble damages for nonbinding recommendations they made to the Secretary because such recommendations "have no legal effect in themselves." *Id.* at 1552. "The Secretary still sets the salable quantity and allotment percentages." *Id.* at 1553. *Berning II* adopted the remedy limitation applied in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), in which shippers challenged the anticompetitive

practices of carriers enaged in collective ratemaking. Finding that there was no statutory immunity for the violations alleged, *id.* at 414, 106 S.Ct. at 1925, the Court applied the venerable rule that the ICC's approval of the bureau's rates precluded a private treble-damage action. *Id.* at 417, 106 S.Ct. at 1927 (citing *Keough v. Chicago & NW Ry.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922)). In both cases, governmental approval was required before there could be any effect from the collective activity and it was such approval that legitimized the allotments and the rates.

This case differs from *Berning II* in that committee members promulgated the maturity regulations themselves rather than making recommendations to the Secretary. Defendants contend, however, that the Secretary tacitly approved the higher maturity standards, by failing to disapprove them as provided for in the regulations governing the committees. *See* 7 C.F.R. §§ 916.62 ("Each and every regulation, decision, determination, or other act of the committee shall be subject to the continuing right of the Secretary to disapprove of the same at any time."); 7 C.F.R. § 917.30 (similar). The mere fact of failure to disapprove, however, does not legitimize otherwise

earlier case. *See* fn. 3, *supra,* and accompanying text. The earlier case was dismissed for failure to exhaust administrative remedies under the Act. Thus, the issue of whether or not defendants were authorized by the regulations to promulgate maturity standards was not decided. Therefore, issue preclusion does not apply. *Operating Eng'rs Pension Trust v. A–C Co.*, 859 F.2d 1336, 1339 (9th Cir.1988).

9. Questions naturally arise from the substantive due process origins of the doctrine, *Carter Coal,* 298 U.S. at 311–12, 56 S.Ct. at 872–73, and the virtual absence of cases striking down a delegation. With respect to federal agencies, only very broad, literally standardless grants of legislative power will offend the Constitution. *See Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989) (upholding law creating Sentencing Com'n); *Skinner v. Mid-America Pipeline Co.*, 490 U.S. 212, 109 S.Ct. 1726, 1731, 104 L.Ed.2d 250 (1989) (requiring that "Congress provide[ ] an administrative agency with standards guiding its actions such that a court could ' "ascertain whether the will of Congress has been obeyed" ' "). The doctrine,

and the "law-making" test, continue to apply in principle to private competitors, although no modern case appears to have struck down a delegation. *See United States v. Frame*, 885 F.2d 1119, 1128–29 (3d Cir.1989) (advisory and ministerial functions not an unlawful delegation), *cert. denied,* —— U.S. ——, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990); *cf. Chiglades Farm, Ltd. v. Butz,* 485 F.2d 1125, 1134 (5th Cir.1973) (upholding celery marketing order on the basis that the Secretary retains ultimate authority), *cert. denied,* 417 U.S. 968, 94 S.Ct. 3170, 41 L.Ed.2d 1138 (1974).

10. The court agrees with the district court that if immunity would exist with respect to federal antitrust liability, it would apply to California's Cartwright Act as well. "Under the Supremacy Clause, [ ] the enforcement of a state regulation may be pre-empted by federal law ... when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (citations omitted).

anticompetitive conduct. First, nondisapproval requires neither publication and comment nor explicit findings. In fact, it does not guarantee any level of review whatsoever. Unlike the procedures in *Square D* and *Berning II,* there is no affirmative process of non-disapproval which can be relied upon fairly to evaluate a committee's regulations. Second, non-disapproval is equally consistent with lack of knowledge or neglect as it is with assent. Defendants' evidence of participation by representatives of the Secretary cannot be considered on a motion to dismiss. The bare fact of non-disapproval, then, which is all that is before the court, does not bring this case within *Berning II.*

### III. Subject Matter Jurisdiction

■ Defendants argue that plaintiffs cannot bring this action until their remedies under the Act are exhausted. Section 608c(15)(A) provides that *handlers* may petition the Secretary for review of any order, provision of such order, or obligation imposed in connection with such order, on the ground that it is contrary to law. Relief may include modification of or exemption from the order or requirement. After the Secretary issues his final ruling, the district courts are vested with jurisdiction to review that ruling. 7 U.S.C. § 608c(15)(B). This scheme is a handler's

exclusive "method of redress" for challenging marketing orders. *Pescosolido v. Block,* 765 F.2d 827, 831 (9th Cir.1985).[11]

Plaintiffs have in fact pursued their administrative remedies in their capacities as handlers. A decision and recommended order of an Administrative Law Judge ("ALJ") issued on May 19, 1989.[12] The Secretary has not yet acted on the ALJ's recommendation.

Plaintiffs argue that this action need not await the Secretary's ruling because it does not challenge the marketing orders themselves, nor any obligation duly imposed thereunder, and because they cannot recover damages (or any retrospective relief) in the administrative proceeding. The court agrees that this case does not require exhaustion of plaintiffs' administrative remedies because that proceeding cannot award the retrospective treble damage relief prayed for under the Cartwright Act. Plaintiffs' alleged losses cannot be recovered, nor the purposes of the antitrust laws vindicated, through that process. Therefore, the court will not imply from section 608c(15) a requirement that plaintiffs exhaust clearly inadequate administrative remedies. *Cf. Coit Indep. Joint Venture v. FSLIC,* 489 U.S. 561, 109 S.Ct. 1361, 1375, 103 L.Ed.2d 602 (1989) ("Administrative remedies that are inadequate need not be exhausted.").[13]

---

**11.** The remedies available to *producers* are even more limited. Producers cannot challenge marketing orders in the district court, and must instead rally a majority of producers to vote in favor of terminating a marketing agreement or order under § 608c(16)(B). *Pescosolido,* 765 F.2d at 831–33. A narrow exception was recognized, "limited to situations in which producers claim that some 'definite personal right' granted by the statute is being infringed by the Secretary acting outside the scope of his delegated authority, with no handler having standing to sue." *Id.* at 832 (based on *Stark v. Wickard,* 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944)). The court also assumed without holding that "if the producers and handlers interests are substantially dissimilar," the producers might have a right to judicial review. *Id.*

**12.** Plaintiffs' request that the court take judicial notice of the content and conclusions of this decision is denied. It is only a recommendation to the Secretary and no final, cognizable decision has been rendered by the Secretary.

**13.** *United States v. Ruzicka,* 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946), does not require a different result. Defendant milk handlers who refused to make payments required by the applicable marketing order sought to resist an application for mandatory injunction on the ground that the government's inspection of their accounts was faulty and its tests were improper. *Id.* at 289, 67 S.Ct. at 208. The Supreme Court concluded that although the statute did not expressly bar these defenses, a requirement that they be pursued through administrative channels was implied, "imbedded in a coherent scheme." *Id.* at 292, 67 S.Ct. at 209. Central to this rationale was that defendants could be adequately reimbursed through the administrative process. *Id. Pescosolido,* 765 F.2d at 831–32 (statutory scheme does not provide for suits by producers, and handlers can protect producers' interests), and *Block v. Community Nutrition Institute,* 467 U.S. 340, 346–48, 104 S.Ct. 2450, 2454–55, 81 L.Ed.2d 270 (1984) (statutory scheme does not provide for suits by consumers, and such suits would disrupt effectuation of

## CONCLUSION

Defendants are not immune as a matter of law for the actions alleged in the complaint. This Court cannot conclude as a matter of law at the pleading stage that the Secretary's failure to disapprove the acts of defendants should immunize their activities. Finally, plaintiffs were not required to exhaust their administrative remedies before instituting this action.

The judgment of the district court is REVERSED and the action is REMANDED for further proceedings consistent herewith.

that scheme), also concern attempts to secure prospective relief. The rationale underlying *Ruzicka* therefore is inapplicable to an antitrust action against committee members for damages arising out of alleged anticompetitive activities.