**WILEMAN BROTHERS & ELLIOTT, INC.; Kash, Inc.; Gerawan Farming, Inc.; Asakawa Farms, Inc.; Chiamori Farms, Inc.; Phillips, Inc.; Kobashi Farms, Inc.; Tange Bros., Inc.; Nagao Farms; Nilmeier Farms; Chosen Enterprises; George Huebert Farms; Wilmer Huebert Farms; Kobashi Farms; Nakayama Farms, Inc.; and Mihara Farms, Plaintiffs–Appellants,**

v.

**Michael ESPY, Secretary of Agriculture, Defendant–Appellee.**

No. 93–16977.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted February 13, 1995.

Decided June 27, 1995.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 18, 1995.

1368

Thomas E. Campagne, Thomas E. Campagne & Associates, Fresno, CA, for plaintiffs-appellants.

Daniel Bensing, Asst. U.S. Atty., Fresno, CA, for defendant-appellee.

Before: TANG and O'SCANNLAIN, Circuit Judges; ROBERT R. MERHIGE, Jr.,* District Judge.

O'SCANNLAIN, Circuit Judge:

We must delve into one of the more byzantine, and all-encompassing, areas of federal administrative regulation—that governing fruits and vegetables. In the process, we decide whether various regulations governing the size, maturity, and advertising of California tree fruits are arbitrary and capricious or otherwise in violation of the rights of those who handle and process the fruits.

I

Wileman Brothers & Elliott, Inc. and other growers, handlers, and processors of tree fruits in California (collectively "the handlers") challenge various regulations contained in the nectarine and peach marketing orders, 7 C.F.R. pts. 916, 917, promulgated by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.* The marketing orders set standards for, among other things, fruit maturity and minimum size. The marketing orders also impose assessments on handlers for the costs of a generic advertising program. The handlers claim that several of these regulations violate their free speech rights, due process rights, the Agricultural Marketing Agreement Act, and the Administrative Procedure Act.

A

■ The Agricultural Marketing Agreement Act of 1937 (the "Act") is the offspring of the Agricultural Adjustment Act, one of

the pillars of the New Deal legislative program. The purpose of the Act is "to establish and maintain ... orderly marketing conditions for agricultural commodities in interstate commerce." 7 U.S.C. § 602(1). The Act authorizes the Secretary of Agriculture to promulgate marketing orders for certain fruits and vegetables. The marketing orders regulate the quality of the commodity and the quantity that may be shipped to market. 7 U.S.C. §§ 608c(6), (7). Everything from avocados to prunes may fall within the reach of these orders.

■ Marketing orders must be subjected to the notice and comment requirements of the Administrative Procedure Act ("APA"). 7 U.S.C. §§ 608c(3), (4). In addition, marketing orders must be approved by either two-thirds of the affected producers or by producers who market at least two-thirds of the volume of the commodity. 7 U.S.C. § 608c(9)(B).

■ Marketing orders are implemented by committees composed of members of the regulated industry. 7 U.S.C. §§ 608c(7)(C), 610. Committee members are appointed by the Secretary and supervised by the Agricultural Marketing Service, an agency within the United States Department of Agriculture ("USDA"). 7 C.F.R. §§ 916.23, 916.62, 917.25, 917.30. The committees recommend rules and regulations to the Secretary to effectuate the marketing orders and to govern such matters as fruit size, fruit maturity, and advertising. The Secretary may then adopt the committees' recommendations through informal rulemaking. 7 C.F.R. §§ 916.51–52, 917.40–41. All committee rules and regulations are "subject to the continuing right of the Secretary to disapprove of the same at any time." 7 U.S.C. § 608c(7)(C); 7 C.F.R. §§ 916.30, 917.62.

■ The expenses to administer the marketing orders are funded through assessments imposed on fruit handlers based upon the volume of fruit they ship. 7 U.S.C. § 610(b)(2)(ii). Expenses fall into four gen-

---

* The Honorable Robert R. Merhige, Jr., Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

eral categories: administration, inspection services, research, and advertising and promotion. The committees are required to submit annual budgets to the Secretary, along with a recommendation as to the rate of assessment for the year. 7 C.F.R. §§ 916.31(c), 917.35(f). The Secretary approves the committees' budgets and the assessments to be imposed on handlers each year in the form of a regulation.

■■■ Any handler may file a petition with the Secretary requesting a modification of the marketing order or an exemption. 7 U.S.C. § 608c(15)(A). An administrative law judge ("ALJ") hears the petition initially, and appellate review is available from the Judicial Officer ("JO") of the USDA. The Secretary's decision, as made by the JO, may be appealed to the district court. 7 U.S.C. § 608c(15)(B). The Secretary is also authorized to seek injunctive relief to compel compliance with all marketing order requirements. 7 U.S.C. § 608a(6).

## B

■■■ In 1958, the Secretary promulgated Marketing Order 916, which regulates nectarines grown in California. 7 C.F.R. pt. 916. The Nectarine Administrative Committee administers the order. The Committee has authority to make rules governing the production and quality of nectarines within its jurisdiction. 7 C.F.R. § 916.30(c). In 1959, the Secretary promulgated Marketing Order 917, which regulates the handling of peaches, pears, and plums grown in California.[1] 7 C.F.R. pt. 917. The Peach Commodity Committee and the Pear Commodity Committee administer the order. These committees also have authority to make rules governing the production and quality of peaches and pears within their jurisdiction. 7 C.F.R. § 917.33(b).

The marketing orders are primarily quality control measures, and each order contains numerous specific regulations. The handlers challenge three particular regulations: (1) the assessments imposed upon handlers to support a generic advertising program; (2) the "well-matured" standard for fruit maturity; and (3) the fruit minimum size standards. These regulations will be discussed in greater detail below.

Appellant Wileman Bros. & Elliott, Inc. ("Wileman") farms approximately 3000 acres of tree fruits. Appellant Kash, Inc. farms approximately 1300 acres of peaches, plums, and nectarines. Both farms pack and market their own fruit, as well as the fruit of other farms, through their own packing houses. Wileman, Kash, and the other appellants have encountered problems with some of their fruit varieties under the maturity and minimum size standards. Beginning in 1987, Wileman and the other handlers began withholding the assessments they were required to pay under the marketing orders.[2]

The complexity of the legal proceedings in this case have been matched by their prolixity. In April 1987, Wileman filed a petition pursuant to 7 U.S.C. § 608c(15)(A) with the USDA challenging the maturity standards and several other portions of the marketing orders. In June 1988, Wileman filed a second petition challenging the maturity standards as amended in 1988 and the generic advertising regulations. In May 1989, the ALJ issued a 400–page final decision on the first petition and ruled for Wileman. In May 1991, the ALJ issued a 369–page final decision on the second petition and again ruled for Wileman.

In the interim, Wileman had also filed a complaint in district court challenging the maturity standards and seeking a temporary restraining order. On August 7, 1987, the district court concluded that it lacked subject matter jurisdiction because Wileman had not exhausted its administrative remedies. On appeal, this court affirmed in an unpublished disposition. *Wileman Bros. & Elliott, Inc. v.*

---

1. The plum portion of the order was terminated in 1991. The provisions relating to pears are no longer at issue.

2. Pursuant to a July 6, 1989 order of the district court, the handlers have paid the assessments due from 1987 to the present into a trust fund account pending resolution of their claims. The majority of handlers subject to the marketing orders continued to pay their assessments, though the amounts increased due to the lost funds from the objecting handlers.

*Yeutter*, 917 F.2d 29 (9th Cir.1990). We noted, however, that we were "appalled by the failure of the Secretary to deal expeditiously with the substantial grievances alleged in this complaint."

In September 1991, the JO of the USDA ruled on Wileman's consolidated petitions, as well as similar claims by fifty-one other handlers, and reversed both of the ALJ's decisions. In a voluminous two-part decision, the JO ruled in favor of the Secretary on all issues.

Over the course of these proceedings, the Secretary also brought a total of fifteen enforcement actions against the handlers pursuant to 7 U.S.C. § 608a(6) to compel payment of the assessments and compliance with the maturity standards. By order of the district court, all assessments due from 1987 to the present have been paid into a trust fund pending resolution of the handlers' claims.

Wileman, along with fifteen other handlers, sought review of the JO's decision in district court pursuant to 7 U.S.C. § 608c(15)(B). The Secretary's enforcement actions were consolidated with the handlers' civil case. On January 27, 1993, on cross-motions for summary judgment, the district court granted summary judgment to the Secretary. The district court also entered judgment for the Secretary for $3.1 million in past due assessments from the handlers. The handlers appeal.

## II

The handlers challenge the generic advertising program administered under the marketing orders on the grounds that it (1) is arbitrary and capricious under the APA, (2) fails to abide by the notice and comment procedures of the APA, and (3) violates their First Amendment free speech rights. We discuss each claim, as well as the relevant aspects of the generic advertising program, in turn.

■ In 1954, Congress amended the Act to permit the Secretary to promulgate mar-

keting orders "providing for the establishment of marketing research and development projects designed to assist, improve, or promote the marketing, distribution, and consumption of any such commodity or product, the expense of such projects to be paid from funds collected pursuant to the marketing order." 7 U.S.C. § 608(6)(I). Subsequently, the Secretary, through formal rulemaking, amended the marketing orders to authorize paid generic advertising programs for nectarines (1966), plums (1971), and peaches (1976). 7 C.F.R. §§ 916.45, 917.39. Ever since, the committees have developed the details of the generic advertising program—radio and TV commercials ("California nectarines are the juiciest"), newspaper inserts ("How to make a peach pie with California peaches"), etc.—and have included an advertising component in their annual budget recommendations. After approving the committees' budget recommendations, the Secretary issues annual assessment regulations, and the handlers are required to pay their pro rata share.[3] 7 U.S.C. § 610(b)(2)(ii).

The handlers first claim the annual assessment regulations are arbitrary and capricious because the Secretary has never justified the need for generic advertising, as opposed to brand-name specific advertising or no collectively-financed advertising at all. The handlers do not challenge the Secretary's original decision after formal rulemaking procedures to authorize a generic advertising program; rather, they claim the Secretary has acted arbitrarily and capriciously in failing to evaluate the benefits of generic advertising in order to determine whether it is worth continuing. According to the handlers, the Secretary has simply rubberstamped the committees' recommendations.

■ Under the APA, we must analyze whether the agency's action is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). "When the arbitrary and capricious standard is performing that function of assuring factual support, there is

---

**3.** For example, in 1992, nectarine handlers were required to pay $0.1825 per 25–pound package of nectarines they shipped. Of this, roughly 53%

went to marketing expenses. 57 Fed.Reg. 45,559 (1992).

no substantive difference between what it requires and what would be required by the substantial evidence test." *Association of Data Processing Serv. Orgs. v. Board of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C.Cir.1984); *see also Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir.1991). Under the substantial evidence standard of review, we consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the agency's decision.[4] *Baxter*, 923 F.2d at 1394. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

The Secretary finds support for his annual assessment regulations and the continuation of the generic advertising program from two sources—the Secretary's own rulemaking records and the recommendations made by the committees. The formal rulemaking records accompanying the Secretary's original decisions to implement the paid advertising programs for nectarines, plums, and peaches are replete with evidence that supports his decision. The following is a typical excerpt:

> The record shows a wide consensus among the peach and pear industries that promotional activities have been beneficial in increasing demand and should be continued.
>
> \* \* \* \* \* \*
>
> Media generally is expensive but some things can be done selectively in this field that are inexpensive and yet create an impact on the buying trade as well as the consuming public. Trade paper ads, particularly at the beginning of the season, together with the editorial support which trade papers are willing to accord an advertiser are helpful in launching a program for seasonal fruits such as peaches and pears. Spot radio or TV commercials in the principal markets during peak movement periods have proved to be successful.

It has been found in many fresh promotional programs that spot announcements, particularly when developed with a "dealer tag" at the end of each spot, have considerable influence in triggering retail promotions.

41 Fed.Reg. 14,375, 14,376–77 (1976). Indeed, the handlers concede that the Secretary's decision was supported by substantial evidence at its inception; it is its continuation that concerns them.

One need not be intimately familiar with the tree fruit industry to suppose that the wholesale and retail markets for fruit and the nature of media advertising have changed significantly in the past twenty years. Changed conditions should prompt the Secretary to revisit the generic advertising program at some point. After all, the Secretary is not passively allowing the generic advertising programs to continue in a vacuum, but is actively approving annual budgets for particularized programs in a changing marketplace. Although the Secretary does not need to reinvent the wheel every year, the Secretary must have at least some relatively current information to rely upon. Otherwise, the advertising program, well-advised in its inception, might become arbitrary and capricious in its application.

 Under the unique regulatory scheme of the Act, the Secretary may rely on the industry-led committees and their staff to do his homework for him and to provide up-to-date information. *See Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479, 1488 (9th Cir.) ("We have no difficulty with the Secretary's decision to rely on the [Navel Orange Administrative Committee] to filter and digest public comments and make a recommendation."), *cert. denied*, —— U.S. ——, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992). The Nectarine Administrative Committee and the Peach Commodity Committee engage in a careful process each year prior to and during their annual spring meetings in approving the advertising program for the upcoming season. Prior to the full committee meeting,

---

4. The ALJ's decisions are treated as part of the record. *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir.), *cert. denied*, 464 U.S. 892, 104 S.Ct. 236, 78 L.Ed.2d 227 (1983). When the agency and the ALJ disagree, as they have in this case, we may give less deference to the agency's findings than they would otherwise receive. *Id.*

the Subcommittee on Advertising and Promotion meets to review in detail the program developed by its staff. The staff in turn uses monthly reports on price trends, consumer interests, and general market conditions in the formation of the proposed advertising program.

In *Riverbend Farms,* 958 F.2d at 1488, this court upheld volume regulations in the navel orange marketing orders against a challenge by handlers that they were arbitrary and capricious. In adopting the regulations, the Secretary apparently relied entirely upon the recommendations of the Navel Orange Administrative Committee ("NOAC"). In response to the suggestion that the Secretary was merely rubberstamping the committees' work, the court stated: "Although the Secretary normally follows the NOAC's suggestions, he retains the authority to depart from or ignore them altogether." *Id.* The same is true here. Although the Secretary has apparently always adopted the committees' budget recommendations, he retains the authority to reject them at any time under 7 U.S.C. § 608c(7)(C).

Finally, it is only because the handlers themselves, through the committees, recommend a budget with a generic advertising component that the program is renewed by the Secretary every year. In fact, in most years the recommendations have been unanimous. We cannot assume that the handlers—the parties with firsthand knowledge of the state of their industry—would make recommendations that have an adverse effect on their businesses. Of course, the interests of the voting committee members may not always coincide with those of every handler in the industry.[5] However, this court has previously noted that the Supreme Court "upheld the constitutionality of the system despite the fact that it may produce results with which some growers or handlers will disagree." *Saulsbury Orchards and Almond Processing, Inc. v. Yeutter,* 917 F.2d 1190, 1197 (9th Cir.1990) (citing *United States v. Rock Royal Coop.,* 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939)).

We therefore conclude that the Secretary's annual assessment regulations for the generic advertising programs are not arbitrary and capricious.

### III

The handlers next claim that the Secretary's annual assessment regulations are rules promulgated without opportunity for notice and comment in violation of the APA.

As noted above, the Act requires each handler to pay its pro rata share of the expenses of the marketing order. 7 U.S.C. § 610(b)(2)(ii). The Nectarine Administrative Committee and the Peach Commodity Committee hold open meetings each spring, at which a budget for the upcoming year is discussed and approved. All handlers are notified of the meetings and are free to attend. The proposed budgets are available to all handlers and the public, and comments may be submitted to the committees. After the budget is passed, the committees recommend the budget to the Secretary. From 1980 to 1987, the Secretary issued regulations approving the proposed budgets and setting the assessment rates without first publishing a proposed rule and without providing opportunity for comment. In 1988 and 1989, a ten-day comment period was provided. Since 1989, a thirty-day comment period has been provided.

As an initial matter, we must determine whether the regulations are indeed "rules" within the meaning of the APA. In *Cal-Almond, Inc. v. USDA,* 14 F.3d 429 (9th Cir.1993), this court held that virtually identical assessment regulations adopted by the Secretary upon the recommendation of the California Almond Board were "rules" under the APA. The APA's definition of a "rule" includes, among other things, "the approval or prescription for the future of rates." 5 U.S.C. § 551(4). The almond marketing order defined the assessment, which was to be collected in the future, as a "rate per pound of almonds." 7 C.F.R. § 981.81(a) (1993). Thus, the court held, the assessment was a rule. *See Cal-Almond,* 14 F.3d at 441.

---

**5.** As we discuss below, the interests of the voting committee members may not always accord with the First Amendment rights of every handler in the industry either.

■ The same analysis applies to the marketing orders in the instant case. The peach marketing order permits the Secretary to establish a "rate of assessment which handlers shall pay with respect to each fruit." 7 C.F.R. § 917.37. The nectarine marketing order does the same. 7 C.F.R. § 916.41. Thus, the annual peach and nectarine assessments are "rules."

The *Cal–Almond* court proceeded, however, to hold that the Secretary's error in failing to provide for notice and comment on the assessment regulations was harmless. *See* 14 F.3d at 442. "[T]he failure to provide notice and comment is harmless only where the agency's mistake clearly had no bearing on the procedure used or the substance of the decision reached." *Riverbend Farms,* 958 F.2d at 1487 (quotation omitted). The harmless error analysis "must therefore focus on the process as well as the result." *Id.* (quotation omitted). The *Cal–Almond* court pointed out that each almond handler was notified of the proposed assessment rate. At the California Almond Board's annual meetings, handlers and other interested parties were free to comment on the proposals. After approval by the committees, the proposed budget was submitted to the Secretary, who used the proposed rate every year in the final assessment regulation. Thus, the handlers were not prejudiced by the Secretary's failure to provide notice and comment because the committee process served as an adequate substitute. *See Cal–Almond,* 14 F.3d at 442. *See also Riverbend Farms,* 958 F.2d at 1487–88 (same holding with respect to weekly navel orange volume restrictions developed through similar procedures).

■ As discussed above, virtually identical procedures were used by the Nectarine Administrative Committee and the Peach Commodity Committee in the instant case to develop budgets under the nectarine and peach marketing orders. The handlers do not dispute that they were aware of the

proposed budgets and were free to make written comments to the committees prior to their approval and recommendation to the Secretary. The handlers have not demonstrated that the procedures in this case were somehow less adequate than those in *Cal–Almond* or *Riverbend Farms*. Consequently, we hold that the Secretary's failure to provide notice and comment on the assessment regulations from 1980 to 1987 was harmless.

## IV

The handlers next claim that the assessments for the generic advertising program force them to provide financial support for messages with which they disagree in violation of their First Amendment free speech rights.[6] The handlers also claim that their ability to disseminate advertising of their own is greatly curtailed by being forced to pay the assessments. The handlers believe that the advertising program helps their competitors more than it helps them, and that they can better spend their marketing dollars on their own.

■ The First Amendment right of freedom of speech includes a right not to be compelled to render financial support for others' speech. *Cal–Almond,* 14 F.3d at 435 (citing *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977)). This is also true when commercial speech is at issue. *See id.* The assessments implicate the handlers' First Amendment rights because they are compelled to provide financial support for particular messages— the generic ads—associated with a particular group—peach and nectarine handlers.

The First Amendment analysis in the instant case is largely governed by *Cal–Almond.* In *Cal–Almond,* this court held that the USDA's almond marketing order, which implemented a generic advertising program for almonds, violated handlers' First Amend-

---

6. The handlers identify two specific messages disseminated by the generic advertising with which they disagree—that "red is better," and that "all California fruit is the same." One handler identified a specific ad that he found objectionable due to its alleged subliminal sexual messages. The handlers also object to a promotional chart, financed by the assessments, listing the "Red Jim" variety of nectarine. The "Red Jim" is not a generic variety of nectarine but a proprietary one, the rights to which are owned by a member of the Nectarine Administrative Committee.

ment rights. Like the peach and nectarine marketing orders at issue here, the almond order imposed an assessment on almond handlers based on the volume of almonds they shipped. A substantial portion of the assessments were used to fund a generic pro-almond public relations program. The court determined that the infringement on the almond handlers' free speech rights should be analyzed under the test for restrictions on commercial speech set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). *See Cal–Almond*, 14 F.3d at 436. Applying this test, the court held that the marketing program was unconstitutional. *See id.* at 437–40.

■■■ Under *Central Hudson*, restrictions on lawful, non-misleading commercial speech are evaluated under a three-part test.[7] First, the asserted government interest behind the restrictions must be substantial. Second, the restrictions must directly advance that interest. Third, the program must not be more extensive than necessary to serve that interest. *See Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. The USDA has the burden of justifying the program by presenting evidence sufficient to satisfy these requirements. *Edenfield v. Fane*, — U.S. —, —, 113 S.Ct. 1792, 1800, 123 L.Ed.2d 543 (1993). We examine each prong in turn.

## A

■■■ First, the Secretary claims that the government has a substantial interest in enhancing returns to peach and nectarine growers. *Cal–Almond* held that the government has a substantial interest in "stimulating the demand for almonds in order to enhance returns to almond producers and stabilize the health of the almond industry." *Cal–Almond*, 14 F.3d at 437. *See also United*

*States v. Frame*, 885 F.2d 1119, 1134 (3d Cir.1989) (government has substantial interest in salvaging the beef industry), *cert. denied*, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990). The handlers point to no reason why the government's interest in promoting peaches and nectarines is any less substantial than it is for almonds.

## B

■■■ Second, the Secretary claims that the generic advertising program directly advances the government's interest in promoting the peach and nectarine growing industries. The program may not be sustained if it "provides only ineffective or remote support for the government's purpose." *Central Hudson*, 447 U.S. at 566, 100 S.Ct. at 2351. The burden is on the Secretary to present objective evidence to demonstrate that the program directly advances the government's interest. *Edenfield*, — U.S. at —, 113 S.Ct. at 1800.

■■■ The Supreme Court assumes as a matter of law that advertising increases consumption of the product being advertised. *Cal–Almond*, 14 F.3d at 439 (citing *Posadas*, 478 U.S. at 342, 106 S.Ct. at 2977). However, according to *Cal–Almond*, the question is not whether the generic advertising program has increased peach and nectarine sales—it undoubtedly has. Rather, the question is whether the mandatory generic advertising program sells the product more effectively than the "specific, targeted marketing efforts of individual handlers." *Id.* Because the almond handlers presented evidence that the assessments hindered their own advertising efforts, and because the Secretary could not provide evidence that the generic advertising program was more effective, the *Cal–Almond* court held that the generic advertising program did not directly advance the government's interest.[8] The *Cal–Almond* court concluded:

---

7. The speech undertaken through the generic advertising program falls squarely within the definition of "commercial speech." *See Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 340, 106 S.Ct. 2968, 2976, 92 L.Ed.2d 266 (1986). Namely, it is aimed at increasing peach and nectarine sales. The han-

dlers do not claim that any other type of speech is implicated.

8. In *Cal–Almond*, the court also noted that one large almond handler, Blue Diamond, may have been manipulating the advertising program for its own benefit. *See* 14 F.3d at 438–39. There is no evidence of such insider control of the com-

We agree with [the handlers'] argument that each handler knows best how to sell his own almonds; we are unwilling to presume, in the absence of hard evidence to the contrary, that a government agency is better at marketing than an individual business person.

*Id.*

The same state of affairs pertains with respect to the generic advertising programs for nectarines and peaches. First, the handlers claim their own advertising efforts are being hampered. For example, appellant Kash, Inc. claims it benefits more from in-store promotions, and that it would devote more resources to such advertising if it did not have to contribute to the generic advertising program. Appellant Gerawan Farming, Inc. suggests that it would advertise its own label. Even if individual handlers were to utilize the same media as used by the generic advertising program, their efforts would undoubtedly differ in the details. The larger handlers, such as Wileman and Kash, were required to contribute $50,000 or more towards the generic advertising program in some years. This is a significant sum of money that could have been used in their own marketing efforts.

Second, the handlers claim there is no evidence that generic advertising significantly benefits the tree fruit industry. Indeed, they point to the testimony of the Chairman of the Management Services Committee, who stated that although each year the industry pays more for the same amount of advertising, the growers' economic position has not improved.

The Secretary, however, claims there is evidence that demonstrates the efficacy of generic advertising. The Secretary suggests that the formal rulemaking record leading to the amendment of the marketing orders to implement the advertising program contains "extensive support." However, the rulemaking records merely recite that advertising

will have a beneficial effect on tree fruit consumption. *See* 41 Fed.Reg. 14,375, 14,-376–77 (1976); 31 Fed.Reg. 5635, 5636 (1966). This uncontroversial assertion, while belaboring the obvious, says nothing about whether mandatory, collectively-financed advertising is more effective than advertising undertaken by individual handlers (or even whether generic advertising is better than brand name advertising).

The Secretary also points to two studies located in the record before the ALJ—the Carmelita Enterprises Report and the NPD/Nielson Inc. Report. The handlers poke several methodological holes in the studies. Most importantly, the handlers claim the studies only demonstrate that advertising increases consumption—again, a rather uncontroversial proposition. The studies do not even discuss whether collectively-financed generic advertising is more productive than the advertising efforts of the marketplace left to its own endeavors.[9] Finally, the Secretary includes a chart in his brief showing that peach and nectarine production increased significantly in the 1980s. However, this chart provides no evidence as to causation; the increase may have been due to weather conditions or cultivation techniques as much as it was due to the generic advertising programs.

■ In sum, the Secretary has demonstrated that advertising increases consumption of peaches and nectarines but has not gone the necessary next step of demonstrating that the generic advertising program is better at increasing consumption than individualized advertising, as *Cal–Almond* requires. Thus, the generic advertising programs for peaches and nectarines do not "directly advance" the government's interest and fail the second prong of the *Central Hudson* test.

**C**

■ Third, the Secretary claims that the generic advertising program is sufficiently

---

mittees here. Nevertheless, the question is not whether competitors on the committee are violating the handlers' First Amendment rights, but whether the *Secretary* is by imposing the assessments that fund the program.

9. In fact, the Carmelita Enterprises Report notes that in-store point-of-purchase advertising may be better than generic television advertising. This is the type of advertising appellant Kash, Inc. claims it would utilize to a greater extent if it did not have to pay the assessments.

narrowly tailored. The Secretary must show that the marketing program "employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 3034, 106 L.Ed.2d 388 (1989).

An obvious alternative to the mandatory, collectively-financed advertising program is a program like the one used under the Almond Marketing Order. The almond handlers had the option of seeking a credit (i.e. a reduction of their assessments) for their own authorized advertising endeavors. 7 C.F.R. § 981.41(c) (1993). The *Cal–Almond* court nevertheless found that the program was not narrowly tailored because the regulations denied credit for certain types of advertisements, such as advertisements promoting products with "competing nuts." 7 C.F.R. § 441(c)(5)(ii). By contrast, the peach and nectarine handlers do not even have the option of seeking a credit for their own advertising endeavors.

One objection to the implementation of a more narrowly tailored program is that a non-mandatory program would give rise to free-rider problems. That is, non-paying handlers would free-ride on the benefits of a generic advertising program while spending their fair share of the assessments on their own advertising. *See Frame*, 885 F.2d at 1133–37 (noting that free-riders would be able to benefit from a collectively-financed beef marketing program if they were not required to pay the assessments). This argument is weak in the case of the peach and nectarine programs, however. First, the credited advertising option under the almond marketing program was more narrowly tailored and yet managed to avoid the problem of free riders; objecting handlers simply had to provide their own mode of transportation in the form of authorized advertising. Second, the handlers point out that there are thirty-three states that commercially handle peaches, and twenty eight that handle nectarines. Yet, California is the only state where handlers are subject to generic advertising assessments. If the Secretary is concerned

about free-riders, there are already plenty of them in other states.

In short, the almond marketing program was less restrictive than the programs for peaches and nectarines; yet, the *Cal–Almond* court held that it was not narrowly tailored. Thus, the generic advertising programs for peaches and nectarines fail the third prong of the *Central Hudson* test as well.

In sum, although we agree that the Secretary has a substantial interest in promoting peaches and nectarines, we hold that forced contributions to pay for generic advertising programs contravene the First Amendment rights of the handlers. The generic advertising programs neither "directly advance" the government's interest nor are they narrowly tailored. They therefore fail the second and third prongs of the *Central Hudson* test and violate the First Amendment.

## V

■ The handlers also challenge the fruit maturity regulations contained in the marketing orders. The Act authorizes the Secretary to regulate fruit by grade and quality in the marketing orders. 7 U.S.C. § 608c(6)(A). In theory, such quality restrictions maintain producer prices by indirectly limiting the quantity of fruit which may be shipped to market, and by excluding less desirable fruit which may depress the price of the entire crop. For several years, the maturity standard in the marketing orders for nectarines and peaches was determined by U.S. Grade 1. For nectarines, this required the fruit to be "mature but not soft or overripe . . . [with] at least 75 percent of the nectarines in any lot [showing] some blushed or red color." 7 C.F.R. § 51.3147. After receiving complaints from customers, the tree fruit committees decided that the marketing orders should be amended to provide for a higher maturity level. The standard, which later became known as the "well-matured" standard, would be based on a test using a spectrum of color chips developed by the Federal–State Inspection Service, an agency within the USDA.[10]

In 1980, the Secretary amended the marketing orders to provide that fruit must grade at least U.S. No. 1 and that "maturity shall be determined by the application of

---

**10.** The maturity regulations for nectarines and peaches are slightly different in their wording

color standards by variety or such other tests as determined to be proper by the Federal or Federal–State Inspection Service." 45 Fed. Reg. 32,308 (1980) (interim final rule); 45 Fed.Reg. 42,252 (1980) (final rule). In 1988, the "well-matured" standard employing the color chip scheme was codified in the marketing orders. 53 Fed.Reg. 19,226, 19,232 (1988) (interim final rule) (codified at 7 C.F.R. §§ 916.356; 917.459).

In 1992, in response to complaints from handlers, the Secretary again modified the regulation by establishing a two-tiered maturity standard for nectarines and peaches. 57 Fed.Reg. 20,735 (1992) (interim final rule); 57 Fed.Reg. 42,681 (1992) (final rule). The minimum maturity standard is now "mature," and handlers may voluntarily seek the "well-matured" designation. The determination of whether fruit is "mature" is essentially the same as it was before the color chip scheme (i.e. U.S. No. 1). The color chip system is still used to determine if a fruit meets the "well-matured" standard. 7 C.F.R. §§ 916.356; 917.459.

The handlers claim the pre–1992 "well-matured" standard was arbitrary and capricious. They claim the use of color chips fails to determine the internal maturity of a fruit and discriminates against certain yellow varieties of nectarines that they grow. The handlers also claim that it is arbitrary to impose the same maturity requirements on fruit shipped great distances such as to the East Coast as are imposed on those shipped within California.

### A

■■■ As a threshold matter, the district court held that the handlers' claims are moot because of the Secretary's 1992 revisions to accommodate "mature" fruit. Both the handlers and the Secretary now argue that the issue is not moot; however, we must consider this jurisdictional issue on our own account. *Mafnas v. Superior Court,* 936 F.2d 1068, 1071 (9th Cir.1991).

The handlers claim that, if we find the pre–1992 regulations to have been invalid for

any reason, they are entitled to relief. As we discuss in Part VIII below, sovereign immunity bars the handlers' claims for consequential damages from the Secretary. However, it does not bar the refund of improper assessments. A significant portion of the handlers' assessments each year has gone to the Federal–State Inspection Service to pay for inspection services, which include enforcement of the challenged maturity regulations.[11] Because the handlers might be entitled to a refund of the portion of their assessments that were used for improper regulations, there is a live controversy as to who is entitled to the assessment monies currently held in trust.

### B

As an additional threshold matter, we also must determine whether the "well-matured" regulations were validly promulgated in 1980. If they were not, then we need only address the substance of the regulations as they were promulgated in 1988, at which point the Secretary re-promulgated the "well-matured" standard. 53 Fed.Reg. 19,226 (1988).

In *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332, 336 (9th Cir.1990), this court held that tree fruit committee members had not acted in accord with the marketing orders in promulgating the heightened maturity standards in 1980 and thus were not immune from suit in an antitrust action brought by several handlers. The court apparently looked to the regulation promulgated by the Secretary in May 1980, 45 Fed. Reg. 32,308 (1980), and determined that it did not clearly authorize the committees to promulgate and to enforce heightened maturity standards on their own. Rather, the "supplementary information" accompanying the regulation merely stated that "provision is made for a higher maturity standard," 45 Fed.Reg. 45,252 (1980), without stating *who* would promulgate it. The committee's subsequent maturity regulations implementing the color chip scheme had not been "recommended" to the Secretary as required by 7

---

and in the color chip schemes actually employed, but the handlers do not distinguish between them in their arguments.

**11.** For example, in 1992, nectarine handlers were required to pay $0.1825 per 25-pound package of nectarines they shipped. Of this, roughly 25% went to inspection services. 57 Fed.Reg. 45,559 (1992).

C.F.R. § 916.52(a). The committee members' actions in promulgating the maturity standards were treated as being unauthorized, and thus were not entitled to immunity. *Giannini,* 909 F.2d at 336.

■ Contrary to the handlers' assertions, *Giannini* did not squarely hold that the maturity regulations were invalidly promulgated in 1980. Not only was *Giannini* primarily concerned with the issue of immunity from an antitrust suit, it was decided in the context of an appeal of a Rule 12(b)(6) dismissal for failure to state a claim. In the context of reviewing the dismissal, the court only reviewed the marketing orders themselves to see if the committee members were clearly authorized to promulgate the heightened maturity regulations. *Id.* at 335. The *Giannini* court could not resolve the ambiguity it found in the regulation promulgated by the Secretary and had to hold in favor of the plaintiffs. This court, because it is addressing the issue on the merits, can look beyond the marketing orders themselves to resolve any ambiguities that may exist. In so doing, it is clear that the Secretary intended to raise the maturity standards and to allow the committees to promulgate the implementing regulations, just as they had with numerous standards in the past. *See* 45 Fed.Reg. 32,-308 (1980).

## C

■ We turn now to the merits of the question of whether the Secretary's decision to adopt the "well-matured" regulation was supported by substantial evidence. *See Baxter,* 923 F.2d at 1394.

The rulemaking record surrounding the 1988 decision to promulgate the "well-matured" standard contains significant evidence

that supports the Secretary's decision.[12] The "supplemental information" accompanying the interim final rule reveals that the Secretary relied on a market study, performed by a marketing consultant, known as the Thuerk Report. 53 Fed.Reg. 19,226, 19,229 (1988). The Thuerk Report analyzed the results of meetings with 25 companies, representing 38.7% of the retail supermarkets in the nation. The Secretary summarized the Report as follows:

> With respect to maturity, the findings indicate that early season fruit which is picked immature does not provide satisfaction to the consumer and does not encourage repeat purchases, and does not benefit the market.

*Id.* at 19,229. The "supplemental information" also contains the findings of a pomologist (a fruit growing expert) from the University of California at Davis that "low maturity fruit tended to be more susceptible to bruising (especially vibration bruising), and also more susceptible to flesh browning following bruising." *Id.* These were additional factors that might discourage repeat purchases.[13]

In sum, we are satisfied that the Secretary "indicate[d] the major issues of policy that were raised in the proceedings and explain[ed] why the agency decided to respond to these issues as it did." *Cal–Almond,* 14 F.3d at 445 (quotation omitted). We therefore hold that the "well-matured" standard—both as promulgated in 1980 and as re-promulgated by the Secretary in 1988—is not arbitrary and capricious.

## VI

The handlers also challenge the fruit minimum size regulations contained in the mar-

12. As for the regulations in effect from 1980 to 1988, we note that the "supplemental information" accompanying the final rule states that "[t]his action is based upon the recommendations and information submitted by the Nectarine Administrative Committee." 45 Fed.Reg. 32,308 (1980). As discussed above, this court has previously held that the Secretary may rely on a committee recommendation to support a decision. *Riverbend Farms,* 958 F.2d at 1488. The handlers have pointed to no reason why the committee's decisionmaking process in recommending the heightened maturity standards in 1980 was flawed.

13. The Secretary also acknowledged receiving negative comments on the maturity standard. To several of these comments, the Secretary simply answered that "the favorable comments and other information sufficiently refuted the unfavorable comments." 53 Fed.Reg. at 19,229. To others, he gave specific responses. For example, one handler apparently complained that the "well-matured" standard did not make sense for fruit shipped to the East Coast, an argument made by the handlers in the instant case. To this, the Secretary responded by pointing to the testimony of a buyer in Massachusetts who supported the standard. *See id.*

keting orders. The Act authorizes the Secretary to regulate fruit by size in the marketing orders. 7 U.S.C. § 608c(6)(A). In 1988, upon the recommendation of the Nectarine Administrative Committee, the Secretary promulgated regulations that increased the minimum size requirements for seventy-five varieties of nectarines. 53 Fed.Reg. 19,226 (1988) (interim final rule); 54 Fed.Reg. 12,-419 (1989) (final rule). Subsequent regulations have made minor changes in the size requirements for several varieties of nectarines. The current minimum size regulations are codified at 7 C.F.R. § 916.356.

The handlers claim that the nectarine minimum size regulations are arbitrary and capricious.[14] The handlers contend that the regulations were promulgated for the impermissible purpose of volume control and discriminate against certain smaller varieties of nectarines. This court must determine whether the Secretary's decision to adopt the minimum size regulations was supported by substantial evidence. *See Baxter*, 923 F.2d at 1394.

█ As we noted above in the context of the annual assessment regulations, the Secretary may rely on the committees to make sound recommendations on fruit size regulations. *See Riverbend Farms*, 958 F.2d at 1488. The Nectarine Administrative Committee's deliberations resulted in the challenged minimum size regulations being recommended to the Secretary with the following justification:

> According to the committee, the proposed changes are necessary to remove from the market those sizes of fruit which are not being well received by consumers. These actions are intended to foster repeat purchase and maintain consumer satisfaction. Early season purchases of small-sized nectarines have a negative impact on total nectarine sales because consumers do not

make repeat purchases after being dissatisfied with their original purchases. According to the committee, increased size requirements are needed to make nectarines more marketable and are essential for the consumer satisfaction needed to maintain current markets and to build new markets.

53 Fed.Reg. 12,687, 12,688 (1988).

The rulemaking record also reveals that the Secretary had substantial evidence to support his decision.[15] First, in response to a request for comments on the proposed regulations, the Secretary received numerous letters from growers and handlers in support of the proposed regulations. The general sentiment expressed in the letters was that consumers wanted bigger fruit, so that is what the growers and handlers should give them. 53 Fed.Reg. 19,226 (1988). Second, the Secretary relied on a market study known as the Thuerk Report that supported the proposed regulations. The Report concluded that "findings indicate that early season fruit which is small in size does not provide satisfaction to the consumer, does not encourage repeat purchases, and nor does it benefit the market [sic]." *Id.* at 19,227.

The rulemaking record also reveals that the Secretary addressed the negative comments that were received. There were several arguments against the standards. Most importantly, some handlers argued that the minimum size requirement would drastically reduce the total volume of fruit shipped. To this, the Secretary responded:

> The Department disputes the contention that the [minimum size] proposal would drastically reduce the volume of fruit shipped because the industry had recognized the fact that in past seasons small size nectarines have been a detriment to the trade and as such the industry has directed its efforts toward production and

14. Although the handlers also refer to the minimum size regulations for peaches in their challenge, it appears that there was no change in the size requirements for peaches in 1988. 53 Fed. Reg. 19,234 (1988). Rather, the packing requirements were altered with an incidental, de minimis effect on the size requirements. 53 Fed.Reg. 12,692 (1988). The handlers have failed to make

any specific challenge to the peach size regulations.

15. The rulemaking record can be found in a "supplemental information" published along with the interim final rule, 53 Fed.Reg. 19,226 (1988), and in the statement published with the final rule, 54 Fed.Reg. 12,419 (1989).

marketing of better quality and larger sized fruit.

*Id.* at 19,227–28. The Secretary subsequently noted that the size regulations may have the opposite effect of that suggested by the handlers. Namely, evidence from the 1988 season demonstrated that "production volume and sales increased with the higher size requirements in effect." [16] 54 Fed.Reg. 12,419, 12,420 (1989).

The handlers make several additional arguments against the regulations. First, the handlers point out that the Secretary also proposed minimum size regulations for plums but dropped the proposal after receiving a large number of negative comments. Rather than reflect arbitrariness, however, this simply reflects the Secretary's responsiveness to the stronger opposition. The handlers also point out that the size regulations do not apply to all varieties of nectarines or peaches. This, the handlers argue, shows that the regulations are arbitrary, because consumers would be likely to reject *all* small nectarines not just small nectarines of certain varieties. However, the Secretary, in the statement accompanying the final rule, addressed this argument with the statement that "[d]ifferent size requirements for different varieties recognize varietal characteristics and market preferences." 53 Fed.Reg. 19,226, 19,227 (1988). Finally, the handlers cite evidence that fruit that fails to meet the minimum size standards nevertheless could be marketed. However, the very point of the regulation was to make sure California fruits were bigger and would thus gain the cachet in the consumer's mind of being big.

In sum, regardless of what the handlers may think of the policies underlying the minimum size regulations, the rulemaking record contains sufficient evidence and a plausible explanation from the Secretary. "So long as [the agency] explains its reasons, it may adopt a rule that all commentators think is stupid or unnecessary." *Riverbend Farms,* 958 F.2d at 1487. In this case, not only did the Secretary explain its decision to adopt

the size regulations, but a significant number of handlers and growers seem to think it was a wise idea.

## VII

The handlers claim the Act violates the nondelegation doctrine because it gives unguided authority to the Secretary to levy assessments. The district court suggested that the handlers are "fifty years too late in pressing an unlawful delegation claim." In fact, they are fifty-six years too late.

In *United States v. Rock Royal Co-operative, Inc.,* 307 U.S. 533, 574–77, 59 S.Ct. 993, 1013–14, 83 L.Ed. 1446 (1939), back in the days when the nondelegation doctrine actually had some vitality, the Supreme Court rejected a similar nondelegation challenge to the Act on the ground that the "Declaration of Policy" section provided sufficient guidance to the Secretary in the development of marketing orders. This section enumerates such purposes as: maintaining orderly marketing conditions; maintaining an orderly flow of supply; promoting production research and marketing research; developing container and pack requirements; developing minimum quality and maturity requirements; and developing grading and inspection requirements. 7 U.S.C. § 602. The Secretary's authority to levy assessments to effectuate these orders is guided by the very same purposes. The Supreme Court has rejected the argument that a delegation of the power to tax (i.e. levy assessments) requires stricter limits on an agency's discretion than a delegation of the power to develop regulations. *Skinner v. Mid–America Pipeline Co.,* 490 U.S. 212, 220–24, 109 S.Ct. 1726, 1731–33, 104 L.Ed.2d 250 (1989). Thus, the authority to levy assessments on handlers is not an unconstitutional delegation of legislative authority.

## VIII

The handlers seek two types of relief. First, the handlers seek unspecified

---

**16.** Some handlers also argued that the effective date of the new regulations was too soon and that growers would not be able to modify their cultivating practices in time. To this, the Secretary responded: "[A]t the time the committee made its recommendation most growers had begun to undertake ordinary cultural practices on their orchards to attain desirable fruit sizes." 53 Fed.Reg. 19,226, 19,228 (1988).

money damages for the allegedly improper maturity and minimum size regulations. Because we uphold both sets of regulations, we need not address this request for relief. Even as to their First Amendment claim, the district court properly held that the handlers' requests are barred by the doctrine of sovereign immunity. In short, claims for money damages from the United States are barred unless the United States has waived its sovereign immunity. *United States v. Testan,* 424 U.S. 392, 401–02, 96 S.Ct. 948, 954–55, 47 L.Ed.2d 114 (1976). There is nothing in the Act or the APA that demonstrates a congressional intent to waive sovereign immunity for the claims raised by the handlers.[17]

■■■■■ Second, the handlers seek a refund of the assessments levied from 1980 to 1986 and the release of the assessments paid into a trust fund from 1987 to the present and currently held by the Registry of the Court. Since they have prevailed on their First Amendment claim, we must evaluate this remedy. The district court held, and we agree, that the refund claims are not barred by sovereign immunity because they are an equitable action for the return of improper assessments.

In *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), the Supreme Court drew a distinction between "an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing ... for the recovery of specific property *or monies." Id.* at 893, 108 S.Ct. at 2731 (emphasis added). The Court held that while the former type of claim could not be brought against the federal government, the latter, even if it required monetary payments, could. *See id. See also McKesson Corp. v. Division of Alcoholic Beverages,* 496 U.S. 18, 32–44, 110 S.Ct. 2238, 2247–54, 110 L.Ed.2d 17 (1990).

The critical question, then, is whether the handlers' request that the improper assessments be returned to them is properly char-

acterized as a claim for damages or as an equitable claim. In *Bowen,* the Supreme Court distinguished the two as follows: "Damages are given to the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.' " *Bowen,* 487 U.S. at 894–95, 108 S.Ct. at 2732 (quoting D. Dobbs, *Handbook on the Law of Remedies* 135 (1973)). *See also id.* at 914, 108 S.Ct. at 2742 (Scalia, J., dissenting) ("Whereas damages compensate a plaintiff for a loss, specific relief prevents or undoes the loss—for example, by ordering return to the plaintiff of the precise property that has been wrongfully taken...."). Here, the handlers seek the return of the precise property that was wrongfully taken from them—the assessments levied in violation of their First Amendment rights. *Cf. Marshall Leasing, Inc. v. United States,* 893 F.2d 1096, 1099 (9th Cir.1990) (holding that an action for recovery of specific property is an equitable action and is not barred by sovereign immunity). The fact that the property taken from the handlers was money does not alter its character as a specific remedy in this case. *See Bowen,* 487 U.S. at 893, 108 S.Ct. at 2731.

In addition, this court, on several occasions, has suggested that a refund of improper assessments is the appropriate remedy for prevailing handlers. For example, in *Cal–Almond,* this court stated that "we have already held that a sufficient remedy for handlers who prevail in their administrative petitions is a refund of any assessments found not to have been due." 14 F.3d at 448 (citing *Saulsbury Orchards,* 917 F.2d at 1195). *See also United States v. Riverbend Farms, Inc.,* 847 F.2d 553, 559 (9th Cir.1988) ("If the Secretary or courts (upon proper appeal) substantiated the challenge, the handler would be entitled to a refund."); *Navel Orange Admin. Comm. v. Exeter Orange Co.,* 722 F.2d 449, 452 (9th Cir.1983). Indeed, in the prior appeal of the instant case, this court stated: "We have previously indicated, however, that a remedy would be

---

17. Under the Act, a handler's petition to the Secretary is limited to "stating that any [marketing] order ... is not in accordance with law and praying for a modification thereof or to be exempted therefrom." 7 U.S.C. § 608c(15)(A). There is no mention of money damages.

available to ... handlers who ultimately prevail in their petitions." *Wileman Bros.*, 917 F.2d 29 (9th Cir.1990). In sum, principles of sovereign immunity do not bar a refund of the specific assessments that were taken from the handlers, a remedy which we have repeatedly indicated would be available.

We emphasize, however, that the handlers are only entitled to a refund of the assessments that were used for the generic advertising programs each year. Because of the fact-intensive nature of this remedial inquiry, we remand to the district court for computation of the refund amount. *See Cal–Almond*, 14 F.3d at 449. On remand, the district court may consider arguments regarding any assessments which were levied under the generic advertising programs.

## IX

For the above reasons, we hold that the three regulations at issue—generic advertising, "well-matured," and minimum size—are not arbitrary and capricious or otherwise in violation of the Administrative Procedure Act. However, we hold that the generic advertising assessments do indeed violate the handlers' First Amendment rights. We therefore remand to the district court to fashion an appropriate remedy consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED. Each party shall bear its own costs.

## ORDER

Sept. 18, 1995

The opinion filed on June 27, 1995 at slip op. 7401 [58 F.3d 1367] is amended as follows:

[Editor's Note: Amendments incorporated for purpose of publication.]

The panel has voted to deny the petitions for rehearing. Judge O'Scannlain has voted to reject the suggestion for rehearing en banc, and Judge Merhige has so recommended.

The full court has been advised of the en banc suggestion, and no judge of the court has requested a vote on it.

The petitions for rehearing are DENIED and the suggestion for rehearing en banc is REJECTED.